**Donald DAVIS, Petitioner,**

v.

**FISK ELECTRIC COMPANY, Fisk Technologies & Fisk Management Inc., Respondents.**

No. 06–0162.

Supreme Court of Texas.

Argued April 10, 2007.

Decided Sept. 26, 2008.

Rehearing Denied Dec. 5, 2008.

Renuka V. Jain, Renuka V. Jain & Associates, P.C., Sugarland, TX, for Petitioner.

J. Cary Gray, Looper Reed & McGraw, P.C., Kyle Wayne Sanders, Looper Reed Mark & McGraw, Richard P. Hogan Jr., Jennifer Bruch Hogan, Hogan & Hogan, L.L.P., Houston, TX, for Respondents.

Virginia K. Hoelscher, Brown McCarroll, L.L.P., Austin, Allecia Lindsey-Pottinger, Houston, TX, for Amicus Curiae.

Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice O'NEILL, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, and Justice WILLETT.

Our rules generally permit each party in a civil action to exercise six peremptory strikes, which are challenges "made to a juror without assigning any reason therefor." TEX.R. CIV. P. 232, 233. But peremptories exercised for an improper reason, like race or gender, are unconstitutional. In this case, the African American petitioner asserted that he was terminated based on his race. The respondents used peremptory challenges at trial to exclude five of six African Americans from the venire but contend that their reasons for doing so had nothing to do with the potential jurors' race. The stated reasons, however, when viewed in conjunction with the 83% removal rate and a comparative juror analysis, defy neutral explanation. Because we conclude that at least two of the strikes were based on race, we reverse in part the court of appeals' judgment and remand the case for a new trial.

## I

### Factual Background

Donald Davis, an African American, worked for Fisk Electric Company as an assistant project manager. In February 2001, Fisk was awarded the contract to install cables at Goodson Middle School, in the Cypress Fairbanks School District. After problems arose on the Goodson project, Fisk terminated Davis. Davis asserts that his termination was based on his race, as evidenced in part by his supervisor's alleged use of the "n-word" when planning Davis's termination.

Davis sued Fisk,[1] claiming violations of 42 U.S.C. § 1981 and the Texas Labor Code. Fisk denied liability. The case was called for trial, and at the conclusion of voir dire, Fisk peremptorily struck six venire members, five of whom were African American and all of whom were minorities. Davis objected, citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),[2] and the trial court, after a hearing, overruled the objection. The jury returned a defense verdict, the trial court signed a take-nothing judgment, and the court of appeals affirmed. 187 S.W.3d 570, 577. We granted Davis's petition for review to apply the United States Supreme Court's most recent guidance on peremptory challenges that are allegedly race-based. 50 Tex. Sup.Ct. J. 446 (Feb. 23, 2007).

## II

### *Batson* Challenge

Davis raises a single complaint: that Fisk struck prospective jurors based on

---

1. Davis sued Fisk Electric Company, Fisk Technologies, and Fisk Management Inc. For simplicity, we refer to respondents simply as "Fisk."

2. In *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 616, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Supreme Court extended *Batson's* prohibition on race-based strikes to civil cases. In *Powers v. Palacios,* 813 S.W.2d 489, 491 (Tex.1991), we followed *Edmonson* and held that "equal protection is denied when race is a factor in counsel's exercise of a peremptory challenge to a prospective juror." For ease of reference, we will refer to the challenge raised in this case as simply a *Batson* challenge.

race, in violation of *Batson.* We last wrote on *Batson* challenges in *Goode v. Shoukfeh,* 943 S.W.2d 441 (Tex.1997), and in the intervening years, the landscape has evolved. Significantly, after the trial in this case, the Supreme Court decided *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("*Miller–El II* "), a case in which the Court concluded that a habeas petitioner was entitled to relief because prosecutors in his criminal trial peremptorily struck potential jurors based on race. Although *Miller–El II* is a criminal case, it involves many of the same factors at issue here, and we examine it in some detail.

The case began with Miller–El's 1986 capital murder trial in a Texas trial court. During jury selection, prosecutors used peremptory strikes to remove ten African Americans from the venire. Miller–El objected that the strikes were improperly based on race, given the Dallas County District Attorney's Office's historic practice of excluding blacks from criminal juries. The trial court concluded that, under *Swain v. Alabama,* which was then the governing standard for complaints of racially based jury selection, there had been no "systematic exclusion of blacks as a matter of policy" by that office and thus no entitlement to a new jury. *Miller–El II,* 545 U.S. at 236, 125 S.Ct. 2317 (quoting *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)). Miller–El was convicted and sentenced to death. *Id.*

While his appeal was pending, the Supreme Court decided *Batson,* "which replaced *Swain's* threshold requirement to prove systemic discrimination under a Fourteenth Amendment jury claim, with the rule that discrimination by the prosecutor in selecting the defendant's jury sufficed to establish the constitutional violation." *Id.* The Court of Criminal Appeals remanded the case to the trial court to

determine whether Miller–El could prove a *Batson* violation. *Miller–El v. State,* 748 S.W.2d 459 (Tex.Crim.App.1988) (en banc).

The trial court reviewed the voir dire record, and one of the prosecutors provided his rationale for previously unexplained strikes. The trial court deemed the explanations "completely credible [and] sufficient" and found there was "no purposeful discrimination." *Miller–El II,* 545 U.S. at 236, 125 S.Ct. 2317. The Court of Criminal Appeals affirmed, stating that the voir dire record provided "ample support" for the prosecutor's race-neutral explanations. *Miller–El v. State,* No. 69,677 (Tex.Crim. App. Sept 16, 1993) (per curiam), p. 2.

Miller–El then sought habeas relief under 28 U.S.C. § 2254, again raising his *Batson* claim. *Miller–El II,* 545 U.S. at 237, 125 S.Ct. 2317. The federal district court denied relief, and the Fifth Circuit refused to certify appealability. *Miller–El v. Johnson,* 261 F.3d 445 (5th Cir.2001). The Supreme Court granted certiorari to consider whether Miller–El was entitled to review of his *Batson* claim and, determining that "the merits of the *Batson* claim were, at the least, debatable by jurists of reason," held that Miller–El was entitled to a certificate of appealability. *Miller–El II,* 545 U.S. at 237, 125 S.Ct. 2317 (citing *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("*Miller–El I* ")). After granting that certificate, the Fifth Circuit rejected Miller–El's *Batson* claim. *Miller–El v. Dretke,* 361 F.3d 849 (5th Cir.2004). The Supreme Court again granted certiorari, *Miller–El v. Dretke,* 542 U.S. 936, 124 S.Ct. 2908, 159 L.Ed.2d 811 (2004), and again reversed, *Miller–El II,* 545 U.S. at 237, 125 S.Ct. 2317, this time on the merits of Miller–El's *Batson* challenge.

Noting that a *Batson* challenge requires an examination of "'all relevant circumstances,'" the Court examined five factors

in determining that jury selection in Miller–El's criminal trial violated the Equal Protection Clause. *Miller–El II*, 545 U.S. at 240, 125 S.Ct. 2317 (quoting *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712). The first involved an analysis of the statistical data pertaining to the prosecution's peremptory strikes. The Court noted that prosecutors used peremptory strikes to exclude 91% of the eligible African–American venire members—a percentage too great to attribute merely to "[h]appenstance." *Id.* at 241, 125 S.Ct. 2317.

The Court then conducted a comparative juror analysis, noting that "[m]ore powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists who were allowed to serve." *Id.* The Court explained that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.* In conducting this analysis, the Court rejected the notion that struck venire members must be compared only to jurors who are identical in all respects (save race): "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." *Id.* at 247 n. 6, 125 S.Ct. 2317. The Court focused on the prosecution's questioning of two black venire members—Billy Jean Fields and Joe Warren—and compared their answers to those given by whites. With regard to Fields, the Court determined that:

nonblack jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to impose a death sentence were not questioned further and drew no objection, but the prosecution expressed apprehension about a

black juror's belief in the possibility of reformation even though he repeatedly stated his approval of the death penalty and testified that he could impose it according to state legal standards even when the alternative sentence of life imprisonment would give a defendant (like everyone else in the world) the opportunity to reform.

*Id.* at 245, 125 S.Ct. 2317.

As for Warren, the Court noted that the State's proffered reason—that Warren's voir dire answers were inconsistent—seemed plausible, but "its plausibility [was] severely undercut by the prosecution's failure to object to other panel members who expressed views much like Warren's." *Id.* at 248, 125 S.Ct. 2317. After comparing his answers to panel members who expressed similar conclusions, the Court decided that race was significant in determining who was challenged and who was not. *Id.* at 252, 125 S.Ct. 2317. The Court also rejected the court of appeals' independent conclusion that Warren expressed general ambivalence about the death penalty, because the prosecutor's stated reasons for striking Warren did not allude to any such ambivalence. *Id.* at 250, 125 S.Ct. 2317. The Court then noted:

[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. *A Batson challenge does not call for a mere exercise in*

*thinking up any rational basis.* If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals's and the dissent's substitution of a reason for eliminating Warren does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions.

*Id.* at 251–52, 125 S.Ct. 2317 (citations omitted) (emphasis added).

A third factor the Court considered was the prosecution's use of the jury shuffle, a practice unique to Texas,[3] and one that the Court held could "indicate decisions probably based on race." *Id.* at 253, 125 S.Ct. 2317. The *Miller–El* jury was shuffled some eight times, at the request of both the prosecution (three times) and the defense (five times). *Miller–El II,* 545 U.S. at 255 n. 14, 125 S.Ct. 2317. The Court noted that " 'the prosecution's decision to seek a jury shuffle when a predominant number of African–Americans were seated in the front of the panel, along with its decision to delay a formal objection to the defense's shuffle until after the racial composition was revealed, raise a suspicion that the State sought to exclude African–Americans from the jury.' " *Id.* at 254, 125 S.Ct. 2317 (quoting *Miller–El I,* 537 U.S. at 346, 123 S.Ct. 1029). This was amplified by testimony that the Dallas County District Attorney's Office had previously admitted to using the shuffle to manipulate the racial makeup of juries. *Id.* The Court concluded:

> The State notes in its brief that there might be racially neutral reasons for shuffling the jury, and we suppose there might be. But no racially neutral rea-

son has ever been offered in this case, and nothing stops the suspicion of discriminatory intent from rising to an inference.

*Id.* at 254–55, 125 S.Ct. 2317 (citation omitted).

A fourth factor the Court relied on was the "contrasting voir dire questions posed respectively to black and nonblack panel members." *Id.* at 255, 125 S.Ct. 2317. Prosecutors gave black panel members a vivid, graphic account of the death penalty before asking about the member's feelings on the subject, while it gave nonblacks a "bland description." *Id.* While the State conceded that disparate questioning occurred, it asserted that the disparity was based on panel members' differing views of the death penalty—those who expressed ambivalence received the "graphic script," while those who did not received the watered-down version. *Id.* at 256–57, 125 S.Ct. 2317. Based on the record, however, the Court concluded that black venire members were more likely to receive the graphic script regardless of their expressions of ambivalence, and the State's explanation failed for four of the eight black panel members who received that script. *Id.* at 258, 125 S.Ct. 2317. Additionally, four out of five nonblacks who were given the graphic script were not those who had expressed ambivalence but were instead unambiguously in favor of, or vehemently opposed to, the death penalty. *Id.* at 259, 125 S.Ct. 2317. The Court also noted that the State disparately used manipulative questioning regarding minimum punishments. *Id.* at 261, 125 S.Ct. 2317. The State conceded that practice but argued that it was premised on opposition to or ambivalence regarding the death penalty, rather than race. *Id.* at 261–62, 125 S.Ct.

---

**3.** *See* Elaine A. Carlson, Batson, J.E.B., *and Beyond: The Paradoxical Quest for Reasoned* *Peremptory Strikes in the Jury Selection Process,* 46 Baylor L.Rev. 947, 981 (1994).

2317. The Court disagreed, noting that "only 27% of nonblacks questioned on the subject who expressed these views were subjected to the trick question, as against 100% of black members. Once again, the implication of race in the prosecutors' choice of questioning cannot be explained away." *Id.* at 263, 125 S.Ct. 2317.

Finally, the Court considered the Dallas County District Attorney's Office's history of "systematically excluding blacks from juries." *Id.* Specifically, the defense presented evidence that the DA's office had adopted a formal policy to exclude minorities from jury service, and that policy was summarized in a " 'manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual]' " that was distributed to prosecutors. *Id.* (quoting *Miller–El I,* 537 U.S. at 335, 123 S.Ct. 1029). Although the manual was written in 1968, the evidence showed it was available to at least one of Miller–El's prosecutors. *Id.* The Court also observed that prosecutors had noted the race of each prospective juror on their juror cards. *Id.*

Considering the totality of the circumstances, the Court held:

> It blinks reality to deny that the State struck Fields and Warren, included in [the] 91% [of black venire members who were struck], because they were black. The strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State. The State's pretextual positions confirm Miller–El's claim, and the prosecutors' own notes proclaim that the Sparling Manu-

al's emphasis on race was on their minds when they considered every potential juror.

*Id.* at 266, 125 S.Ct. 2317. Holding that the state court's conclusion about the prosecutors' strikes of those two jurors was wrong "to a clear and convincing degree," the Court reversed the court of appeals' judgment and remanded the case for entry of judgment for Miller–El, "together with orders of appropriate relief." *Id.*

## III

### Batson Procedure

 With this context in mind, we turn to the *Batson* challenge at issue in this case, but first address a procedural matter. Davis presented his *Batson* objection at the conclusion of voir dire, after both sides exercised their peremptory challenges. Fisk then defended its strikes, beginning with Juror No. 5, Michael Pickett. The trial court immediately overruled the *Batson* objection upon hearing Fisk's explanation. Davis's counsel asked to address Fisk's reasons, "to preserve the record here." The trial court answered: "You've raised the objection. That burden shifts. The burden has shifted. I overruled the objection. No. 9. Let's move on. If you want to put something on the record at the conclusion of this, we can do so. No. 9?" A similar procedure was followed for Fisk's justification for each of the remaining strikes.

 By overruling the objection before permitting Davis to rebut Fisk's explanations, the trial court overlooked part of Batson's third step.[4] *See Goode,* 943

---

4. As we have noted:

 At the first step of the process, the opponent of the peremptory challenge must establish a prima facie case of racial discrimination.... During the second step of the pro-

 cess, the burden shifts to the party who has exercised the strike to come forward with a race-neutral explanation.... It is not until the third step that the persuasiveness of the justification for the challenge becomes rele-

S.W.2d at 445–46. We do not doubt the trial court's full engagement in the voir dire and *Batson* proceedings, but it nonetheless should have permitted Davis's counsel to rebut Fisk's explanations, rather than ruling before she had the opportunity to do so. *Id.* at 452 ("Because the party challenging the peremptory strikes has the ultimate burden of persuasion, we conclude that the trial court should provide the party challenging the strikes ... a reasonable opportunity to rebut the race-neutral explanations.") (citation omitted). Davis complains of the trial court's evading the third step, and the court of appeals held that Davis waived the objection by not raising it in the trial court. 187 S.W.3d at 581. To the contrary, Davis's counsel specifically asked the trial court to address Fisk's explanations for the strikes. The trial court refused her request but said that she could "put something on the record at the conclusion of this." We conclude that Davis's request was sufficient to advise the trial court of the complaint, and Davis did not waive the objection.

Nonetheless, the error in failing to follow proper procedure was harmless in this case. The trial court permitted Davis to make a bill after the *Batson* hearing, and Davis's counsel addressed Fisk's strikes and the explanations given. After listening to this argument, the trial court again overruled the *Batson* objection, "find[ing] that the Defense has articulated reasons, at least for their decisions on particular jurors on a nonrace basis for striking them."

## IV

### Standard of Review

■ In contrast to the federal system, which employs a "clearly erroneous" standard of review, we review a trial court's *Batson* ruling for abuse of discretion. *Goode,* 943 S.W.2d at 446 (noting that "[a] trial court abuses its discretion if its decision 'is arbitrary, unreasonable, and without reference to guiding principles'" and observing that standard is "similar, although not identical to," federal "clearly erroneous" standard); *cf. Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (holding that a trial court's finding will not be disturbed unless the appellate court is "'left with a definite and firm conviction that a mistake has been committed'") (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)); *Young v. State,* 826 S.W.2d 141, 144 (Tex.Crim.App.1991) (noting that "[a] reviewing court should reverse [trial court's] findings only when they are not supported by sufficient evidence or, as we often say, for an 'abuse of discretion'"). In *Miller–El I,* a habeas proceeding governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996, the Supreme Court noted that it would "presume the Texas court's factual findings to be sound unless Miller–El rebut[ted] the 'presumption of correctness by clear and convincing evidence.'" *Miller–El II,* 545 U.S. at 240, 125 S.Ct. 2317 (citing 28 U.S.C.

---

vant. At the third step of the process, the trial court must determine if the party challenging the strike has proven purposeful racial discrimination, and the trial court may believe or not believe the explanation offered by the party who exercised the peremptory challenge. It is at this stage that implausible justifications for striking potential jurors "may (and probably will) be found [by the trial court] to be pretexts for purposeful discrimination." Nevertheless, the Supreme Court has emphasized that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the [peremptory] strike."

*Goode,* 943 S.W.2d at 445–46 (citations omitted).

§ 2254(e)(1)). Like our abuse of discretion standard, *see Goode,* 943 S.W.2d at 447, the standard applied in *Miller–El II* was "demanding but not insatiable," and " '[d]eference does not by definition preclude relief.' " *Miller–El II,* 545 U.S. at 240, 125 S.Ct. 2317 (quoting *Miller–El v. Cockrell,* 537 U.S. at 340, 123 S.Ct. 1029); *see also United States v. Williamson,* 533 F.3d 269, 274 (5th Cir.2008) (noting that, although " '[t]he trial court has a pivotal role in evaluating *Batson* claims,' . . . we are also cognizant that the Supreme Court has made plain that appellate review of alleged *Batson* errors is not a hollow act") (quoting *Snyder v. Louisiana,* 552 U.S. ——, ——, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)). We now turn to an analysis of "all relevant circumstances."

# V

## Analysis

### A

### Statistical Disparity

■ Here, as in *Miller–El,* the statistics are "remarkable." *Miller–El II,* 545 U.S. at 240, 125 S.Ct. 2317 (noting that prosecutors used peremptory strikes to exclude 91% of eligible black venire members). Jurors were chosen from the first twenty-eight members of the venire. At the conclusion of the parties' questioning, four panelists were struck for cause or by agreement, and the parties then submitted

their peremptory challenges. Fisk struck five of the six African Americans (83%) but only one (5.5%) of the eligible nonblack prospective jurors,[5] and "[h]appenstance is unlikely to produce this disparity." [6] *Miller–El I,* 537 U.S. at 342, 123 S.Ct. 1029.

### B

### Comparative Juror Analysis

Beyond the raw statistics, a comparative juror analysis is similarly troubling. Fisk struck Juror No. 12, Patrick Daigle, and provided the following explanation:

> Of all the jurors, juror No. 12, who initially I thought would be good a good [sic] juror for us, reacted that corporations should be punished with the use of punitive damages. He was the most clear on that subject. In addition, I attempted to draw out of him a discussion from him about his involvement in this management-employee committee thing at Continental, something that would make me think he recognized that many of the discrimination claims that they deal with—I know he said he didn't have any personal involvement with race discrimination cases; but he seemed to be too ready to believe that Continental has discriminatory employment practices; which, you know, I could be totally wrong about this, Your Honor; but my belief is that I tend to have a high degree of skepticism about that, about Continental and the fact that he didn't

---

5. Fisk used its sixth strike to remove a venire member of Asian descent. Davis initially included this juror within the *Batson* challenge but later abandoned the claim. We note, however, that Davis could have challenged this juror's exclusion as well, even though he and the venire member were not the same race. *Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that a defendant may object to race-based peremptory challenges whether or not he and the excluded juror share the same race).

6. The concurrence's focus on *Davis's* strikes misses the mark, as they do not answer whether *Fisk's* strikes were improperly based on race. *Cf. Miller–El II,* 545 U.S. at 255 n. 14, 125 S.Ct. 2317 (criticizing the Fifth Circuit for declining to give much weight to the evidence of racially motivated jury shuffles because Miller–El had shuffled the jury five times and prosecutors shuffled only twice: "Miller–El's shuffles are flatly irrelevant to whether prosecutors' shuffles revealed a desire to exclude blacks.").

have that same skepticism caused me to believe they we should exercise a challenge on him.

The trial court then immediately overruled Davis's *Batson* objection to the strike.

Davis's counsel conducted the only questioning on punitive damages, and, as is evident from the colloquy,[7] Daigle never verbally responded to the questions about punitive damages. Fisk nonetheless asserted in the trial court that Daigle nonverbally "reacted that corporations should be punished with the use of punitive damages." Fisk did not elaborate on the type of nonverbal conduct that Daigle manifested, other than to say Daigle was "most clear" on the subject. Davis's counsel objected that "the nonverbal cues that Defense Counsel has cited throughout are not

supported by the record" and also noted that Fisk never attempted to question Daigle about any alleged "nonverbal cues."[8]

█ Last term, the Supreme Court decided a *Batson* case involving nonverbal conduct. In *Snyder v. Louisiana,* the Court held that the prosecution improperly struck a potential juror. *Snyder,* 552 U.S. at ——, 128 S.Ct. 1203. The prosecution gave two reasons for its strike, one of which was that Brooks, the potential juror, looked "very nervous" throughout the questioning. *Id.* at ——, 128 S.Ct. 1203. The Court noted that the "record [did] not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor." *Id.* at ——, 128 S.Ct. 1203. Absent such a finding, the Court concluded

---

7. The entire exchange consisted of the following:

> Davis counsel: Does anybody here feel that punitive damages do what they're meant to do, punish the person and stop the person from doing the same thing again? That's what punitive damages are. Do people think that in certain cases punitive damages should be awarded? Do you think that punitive damages is something that always compensates a victim? You feel that? Let's have you hold up your card, and I want everybody who feels that punitive damages always compensates a victim. Juror No. 26 [Vinzant], 13 [Parker], 7 [Johnson].
>
> Donaldson: I have to qualify that.
>
> Prescott: I'll qualify my answer.
>
> Davis counsel: I'd like your qualifications.
>
> Donaldson: It depends on the amount.
>
> Davis counsel: I can't see. Can you hold it up, please? 47? My eyes are getting bad with old age. 44. All right. Juror No. 35, what's your qualification?
>
> Donaldson: I'm just saying that there is a dollar limit. I mean, we're talking reasonable sums of money here.
>
> Davis counsel: Yes.
>
> Donaldson: That's fine. If we're talking about $80 million, okay, that's absurd.
>
> Davis counsel: Would the reasonableness of the sum, would you agree with me, depends upon the facts?

> Donaldson: Yes.
>
> Davis counsel: And y'all understand that with every question I'm asking you the judge is going to give you the instructions very specifically on every aspect of the question that I've asked in this case; and all you'll have to do is follow the law, right? Juror No. 26, will you have a problem with awarding punitive damages?
>
> Vinzant: No, but I think the amount of punitive damages required to punish a company is often not the same as should be awarded to the individual. It's a different scale.
>
> Davis counsel: Juror No. 13, you're opposed to punitive damages? Parker: Yes.
>
> Davis counsel: Juror No. 26? I've already talked to you, sorry. 47? What was your opinion on the punitive damage question? You said that they overcompensated—
>
> Prescott: If it's an absurd amount, it would be overcompensated.
>
> Davis counsel: And Juror No. 44, you said you would qualify your answer too, correct? And does the qualification depend on the facts, depends on the amount?
>
> Prescott: Yes.

8. The concurrence's statement that "no one denied at trial, or denies even today, that the struck jurors reacted just as Fisk's counsel said they did" unfairly narrows Davis's objection that the nonverbal conduct was "not supported by the record."

that it could not "presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous." *Id.* Thus, while "deference [to the trial court] is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike," *id.* at ——, 128 S.Ct. 1203, here there was no such finding, and we cannot presume the trial court credited Fisk's explanation.

Additionally, the lack of further detail about Daigle's purported reaction, Fisk's failure to question Daigle about it, and the failure to strike a white juror who expressed verbally what Daigle purportedly did nonverbally, give us pause. Peremptory strikes may legitimately be based on nonverbal conduct, but permitting strikes based on an assertion that nefarious conduct "happened," without identifying its nature and without any additional record support, would strip *Batson* of meaning. Opposing counsel must have an opportunity to rebut the accusation, the trial court must be enabled to decide whether the charge accurately describes what happened during voir dire, and the appellate court must have a record on which to base its analysis. Verification of the occurrence may come from the bench if the court observed it; it may be proved by the juror's acknowledgement; or, it may be otherwise borne out by the record as, for example, by the detailed explanations of counsel. We do not think *Snyder* excludes sources of verification other than an explicit trial court finding. *See, e.g., People v. Davis,* 164 Cal.App.4th 305, 78 Cal.Rptr.3d 809, 817 (2008) (*Snyder* did not require reversal based on demeanor-related strike even though trial court did not make an explicit finding as to demeanor, as juror's "demeanor [was] shown on the record from her lateness and inability to follow the court's instructions" and thus "[n]o further finding was needed"). The point, instead, is that the communication be proved and reflected in an appellate record, and counsel must, therefore, identify that conduct with some specificity.

 Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales. Our sister court which, as we have noted, has a much more developed *Batson* jurisprudence than we do, *see Goode,* 943 S.W.2d at 450,[9] has held that a prosecutor's statements that he didn't like a venireman's "attitude, his demeanor" were pretextual when his verbal answers failed to show hostility, and the prosecutor "never mentioned any specific body language, or any other non-verbal actions which led him to believe the venireman was biased against his case."[10] *Hill v. State,* 827 S.W.2d 860,

---

9. Some research suggests that over 94% of *Batson* complaints occur in criminal cases. See Kenneth J. Melilli, Batson *in Practice: What We Have Learned About* Batson *and Peremptory Challenges,* 71 Notre Dame L.Rev. 447, 458 (1995).

10. In a later case, the Court of Criminal Appeals found the following "demeanor" explanation to be sufficiently specific to survive a *Batson* challenge:

Prosecutor: Mr. Martinez, quite frankly, Judge, the notes I put down when I got through talking to him was he has poor facial expressions. He's very inattentive, looks unhappy to be here, body language, posture was such that just made him feel he was uncomfortable. The only way I can characterize it is he had a very long, unhappy face, mouth down-turned at the corners, eyes downcast. And he was, quite frankly, that way not only to the State, but when being addressed by Defense Counsel.

My feelings were is that [sic] he just wasn't-didn't want to be here, wasn't happy to be here, and I just felt like he was an unknown quantity rather than risk having an unhappy person on the jury or somebody that

869–70 (Tex.Crim.App.1992) (noting that "the record speaks for itself"); *accord Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir.1992) (noting that demeanor-related reasons may be legitimate basis for peremptory challenge "if they are sufficiently specific to provide a basis upon which to evaluate their legitimacy"); *Mack v. Anderson*, 371 Ill.App.3d 36, 308 Ill.Dec. 215, 861 N.E.2d 280, 297 (2006) (noting that "conduct and demeanor must be given close scrutiny because such perceptions may easily be used as a pretext for discrimination" and, because attorney "did not make a record by providing a clear and reasonably specific explanation of what he perceived to be" the struck juror's "disinterest," the record failed to support the race neutral explanation given); *Zakour v. UT Med. Group, Inc.*, 215 S.W.3d 763, 774–75 (Tenn.2007) (holding that "to avoid a *Batson* violation, it is important that counsel specifically state the particular body language that forms the basis for the peremptory challenge"; lawyer's identification of body language must be "sufficiently specific to provide a basis upon which to evaluate [its] legitimacy," and "body mechanics" was not detailed enough to survive *Batson* objection) (citation omitted); *see also Blades v. Miller*, 261 Fed. App'x 314, 315–16 (2d Cir.2008) (affirming trial court's acceptance of specific body language, including crossed arms, as a race-neutral explanation, as well as trial court's rejection of strike based on "body language in a formulaic, non-specific way"), *cert. denied*, —— U.S. ——, 128 S.Ct. 2971 (2008). *Batson* requires a "clear and reasonably specific explanation" of the legitimate reasons for a strike, *Batson*, 476 U.S. at 98 n. 20, 106 S.Ct. 1712 (quoting *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct.

1089, 67 L.Ed.2d 207 (1981)), and merely stating that a juror nonverbally "reacted" is insufficient.

Fisk's failure to question Daigle about his purported reaction also suggests that Daigle's reaction had little to do with Fisk's strike. *Miller–El II*, 545 U.S. at 246, 125 S.Ct. 2317 (noting that the prosecution's failure to question prospective juror about reason given for strike suggested pretext; prosecutor "probably would have [questioned him] if the family history had actually mattered") (citing *Ex parte Travis*, 776 So.2d 874, 881 (Ala.2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.")); *Alex v. Rayne Concrete Serv.*, 951 So.2d 138, 154 (La.2007) (noting that "the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence" of pretext). Moreover, Fisk did not strike Vinzant, a white juror who stated that he would not have a problem awarding punitive damages. *See Miller–El II*, 545 U.S. at 248, 125 S.Ct. 2317 (holding that evidence of pretext exists if a reason applies equally to other panel members, who were not minorities and not struck). These factors suggest that the stated reason—Daigle's "reaction" to punitive damages—was pretextual.

Thus, we turn to the remaining reason offered for striking Daigle: that he seemed too eager to believe that his employer, Continental Airlines, discriminated against employees and that he did not express sufficient skepticism about discrimination claims. Daigle, a seventeen-year employee of Continental, listed his occupation as "customer service manager" and explained his job as follows:

didn't respond readily to questions that were asked, would be to strike him, Judge.

*Yarborough v. State*, 947 S.W.2d 892, 893, 896 (Tex.Crim.App.1997).

Daigle: It's called aide-of-counsel. It's just like having a union without the union. We're the representative between management and the person. But every time we hear a case we don't hear it from our office. We have to judge the case from someone else's office. So like in this case, I don't know either party, which is what we do over there; so it doesn't give us a bias about somebody that we work with. We have to judge their performance and have that bias about, "Well, I know this individual. Can I judge fairly?" We deal with different offices. We have three offices, Tampa, Salt Lake, and Houston. So they'll send us a case from another office versus here at home.

Fisk counsel: And by separating it out so that you don't know the people, that way they're limiting the bias that somebody might have from knowing the party?

Daigle: Yes.

Fisk counsel: Then you know exactly what we're doing with this voir dire process?

Daigle: Yes.

Fisk counsel: Do you deal with the cases sometimes where an employee says they're being discriminated against because of race?

Daigle: We deal with all of it.

Fisk counsel: Race?

Daigle: Race discrimination, everything.

Fisk counsel: And are there times when employees have said, "Something happened to me because of race" at Continental where the panel you were on agreed with that?

Daigle: That we agreed on it?

Fisk counsel: Right.

Daigle: I've never been on a case of race myself.

Fisk counsel: You've never been on a case of race yourself?

Daigle: No.

Fisk counsel: But what you do in these cases though is listen to both sides and try to determine whether there is a basis in fact for the belief that an adverse job determination was discriminatory.

Daigle: Yes, well, have to decide whether management was right or the employee was right.

Fisk counsel: Okay.

Daigle: Either management right [sic] on their decision or the employee has a right to come back.

Fisk counsel: And I do understand correctly what you're telling us is there's nothing about either that or your feelings with regard to a prior employment situation that makes you feel inclined to start this case, giving the Plaintiff a little bit of a head start?

Daigle: No.

The court of appeals held that Fisk's explanation for striking Daigle sufficed, because even though Daigle stated he could be fair, "counsel is not required to take all voir dire answers at face value." 187 S.W.3d at 585. While that is true, there is nothing in the voir dire record to support counsel's explanation that Daigle believed Continental discriminated against employees—indeed, Daigle, a longtime employee, stated that leaving his old job for Continental was "a better move for [him]," and the only thing he said about race discrimination cases was that he had never been involved with one. At best, the record shows that Daigle was neutral about employment discrimination issues, providing no support for Fisk's asserted reason for striking him. Even if Fisk were concerned about Daigle's description of his aide-of-counsel position as "like having a

union without the union" (a concern that was never expressed at trial), it does not explain why Fisk failed to strike (or even question) juror 27, a white woman, about her membership in a union.

■ On appeal, Fisk cites Daigle's voir dire responses about past personal experiences with discrimination as a basis for the strike.[11] This reason—never advanced in the trial court—may not now be used to justify the strike. *See, e.g., Miller-El II*, 545 U.S. at 252, 125 S.Ct. 2317 (noting that, "when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives"); *see also id.* (noting that reason given during *Batson* hearing but after State's initial reasons were shown to be incorrect "reeks of afterthought" and showed "pretextual timing"). On balance, we conclude that Fisk's reasons for striking Daigle "cannot reasonably be accepted." *Miller-El II*, 545 U.S. at 247, 125 S.Ct. 2317 (citing *Miller-El I*, 537 U.S. at 339, 123 S.Ct. 1029 (noting that the credibility of reasons given can be measured by "how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy")).

Although the improper exclusion of even one juror is unconstitutional, *Snyder*, 552 U.S. at ——, 128 S.Ct. 1203, we also find troubling Fisk's strike of Michael Pickett, juror no. 5. Fisk explained its reasons for striking Pickett as follows:

> Before I ever came to court today, I had a problem with Juror No. 5 because he is a musician. And the fact that that is his only employment causes me to believe that he would not be a very good Defense juror in any case and certainly

in this case where the issue is people getting laid off over job performance and things of that nature. Also when Juror 29 made a — I don't remember whether it was a solicited or unsolicited comment about having friends of African-American race, he was one of the jurors who noticeably laughed at that; and it was clear from his reaction he did not believe that. And there were two or three other people who were challenged on that same basis. He also is one of the people who appeared to us to have the strongest reaction to this whole "N" word issue. And whether or not his feelings about the company, if there is testimony that one of the people in the company used the "N" word — you want me to keep going?

We note that Fisk never questioned Pickett about his job but instead relied on Pickett's juror information card, which stated that Pickett was a musician employed by Pleasant Hill Baptist Church. *Miller-El II*, 545 U.S. at 244, 125 S.Ct. 2317. Moreover, while facially race-neutral, this reason becomes less so when Pickett is compared to other jurors who were not struck. Juror No. 2 was unemployed; Juror No. 26 had been terminated and then sued his employer to enforce an employment contract; Juror No. 4's husband had been laid off repeatedly from construction jobs, and she stated that in the last two years he had experienced "really bad" problems in finding new employment; Juror No. 10 had been terminated. It is difficult to imagine that Pickett, who was employed and who did not respond affirmatively when Fisk inquired whether anyone had been terminated or when Fisk asked the panel whether, if they were involved in industries in which

---

**11.** The court of appeals noted this "completely new" reason but did not reach the question of whether Fisk could rely on that reason, as that court concluded that the reasons advanced at trial justified the strike. 187 S.W.3d at 585 n. 3.

there were layoffs, they could not be fair and impartial, was less desirable than these jurors because of his musical career. Instead, it seems that the strike was "based on a group bias where the group trait is not shown to apply to the challenged juror specifically," *Whitsey v. State*, 796 S.W.2d 707, 716 (Tex.Crim.App.1989) (holding that prosecutor's strike of black female juror because she was a teacher and teachers were "liberal," when nothing in the record bore out that characterization, was "insufficient as a matter of law"), and suggests pretext.

Another proffered reason for striking Pickett was that he reacted strongly when asked about the "n-word." The anticipated trial evidence included testimony that Davis's supervisor had referred to him using "the n-word." Davis's counsel mentioned this during voir dire, and Fisk's attorney conducted follow-up questioning on the matter. Fisk explained its strikes of three African–American jurors (Pickett, Euline Edmund, and Mary Harts) in part based on their verbal and nonverbal responses to the n-word questioning. Counsel stated that Pickett was "one of the people who appeared to us to have the strongest reaction to this whole 'N' word issue"; Edmund "[o]f all of the people on the panel, … appeared to us to have the strongest feelings on the subject of the 'N' word"; and Harts was "also one of the jurors who had the strongest reactions to the subject use of the 'N' word."

But an examination of the voir dire on the n-word issue shows that Pickett, Edmund, and Harts were no more offended by the n-word than Martha Ann Stehling, Clara Reynaga, and John David Vinzant, three nonblack venire members who were not struck and who were seated on the jury.[12] While Edmund stated that she had

"a real hard time with" Davis's supervisor's use of the n-word, Reynaga immediately agreed, stating "I also feel the same way, and we all know that words are preceded by thoughts. So even before he said it, those thoughts were there." The remainder of Fisk's questioning on the n-word follows:

Fisk counsel: Okay. Anybody else who feels that way? Juror No. 5?

Pickett: Well, I have to qualify that. Depending on what the evidence was, just because he said that didn't necessarily mean that was the reason he was terminated; but the fact that he said that is a real big problem.

Fisk counsel: But the fact is you don't like it, right? If he said it, you don't like it?

Pickett: It's not whether or not I like him or not.

Fisk counsel: No, I'm not talking about him, it. You don't like it, that he said it, right? Is that what you're saying?

Pickett: Correct.

Fisk counsel: But you would say that that's a different question from how the decision was made and why the Plaintiff was discharged, and you would listen to that evidence?

Pickett: If the evidence pointed to that, it is possible to make that kind of a decision.

Fisk counsel: And Juror No. 3., Ms. Reynaga, do you agree with that?

Reynaga: Yes.

Fisk counsel: Anybody else who feels like they couldn't, based on what they've heard so far, listen to the Court's instructions, follow the Court's instructions? Juror No. 26, you were raising your card there?

---

12. Indeed, it would be surprising if venire members did not react to what is, particularly in this day and age, a universally offensive epithet.

Vinzant: I mean, I agree. I can listen and follow the Court's instructions, but the way you've been saying it, that the company has a problem with people using that word, to me that's a cultural management company problem. I don't know that people's roles—and I'm sure that will come out in evidence. But if it's a systemic cultural problem with the company, am I going to be predisposed one way or the other? I am.

Fisk counsel: If you find out that that is a cultural systemic problem in the company and that there are a bunch of people besides Mr. Blanton who are alleged to have said that and you hear that evidence, that's going to be important evidence to you, is what you're saying?

Vinzant: Extremely important.

Fisk counsel: Number one, y'all know I'm not and neither is counsel for the Plaintiff, giving you the evidence in this case. You'll hear the evidence from the witness stand. Everybody understands that, right? And then, number two, I think it's significant at this point for me to say that Mr. Blanton doesn't work for this company anymore. He's going to testify. But I want to get it back on track here a second, okay, because I said this a minute ago: I don't think whether— now, listen to me here. I'm going to remind you of this: In closing arguments I'll say this again. I don't think whether Mr. Blanton is a raving racist or not—and I don't think he is—but if he is, I don't think it has anything to do with the discharge decision in this case. And that's because I think when you hear all of the evidence—in fact, things I'm not sure Ms. Jain even knows right now—you'll realize when you hear how the deci-

sion was made and now just how, who made the decision, then you're going to realize we're in a smoke screen here. Okay. Juror No. 25?

Stehling: I think you've already prejudiced—you're making us question the credibility of your witness already.

Fisk counsel: You're talking about Mr. Blanton?

Stehling: Yes.

Fisk counsel: Well, that's a fair comment. Why do you feel that way?

Stehling: Because you've already presented this information about what's happened. It's inappropriate.

Fisk counsel: It was inappropriate to say that he said the "N" word?

Stehling: Well, we're going to have to keep hearing about someone using the "N" word.

Fisk counsel: Well, actually what I believe the testimony was was that after the discharge decision was made Mr. Blanton was having a conversation with someone where he said basically, "We're going to do this. We're going to have to be careful how we do it because he's an 'N' person." Now, that's based on testimony that was given.

Stehling: I don't think you made a good impression of the credibility of your witness.

Fisk struck the three African–American venire members who participated in this colloquy but not their white and Hispanic counterparts, who responded at least as strongly to the n-word issue. Fisk's stated reasons for the strikes included the venire members' reactions to the n-word issue. "The fact that [a given] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." [13] *Miller–El II*, 545

13. This is nowhere more obvious than in Fisk's strike of Harts, based in part on Fisk's

U.S. at 248, 125 S.Ct. 2317; *see also United States v. Huey,* 76 F.3d 638, 641–42 (5th Cir.1996) (holding that defendant's assumption that minority jurors would be biased after hearing racial slurs on tape recordings was "nothing more than an assumption of partiality based on race and a form of racial stereotyping, both of which have been repeatedly condemned"; excluding minority venire members on that basis violated *Batson*). Pickett's "strong reaction" in the form of his verbal responses to Fisk's questions was no stronger than some of his nonblack counterparts, and Fisk's strike on this basis suggests pretext.

The final reason given for striking Pickett was that he laughed when Juror 29 said he had African American friends. Davis disagrees that Pickett's laughter was based on that statement but instead asserts that it was in response to Juror 29's joke about a friend who was more successful than he. Even assuming Fisk's explanation was correct, Fisk also claimed to have challenged two or three other venire members for the same reason. But, in fact, Fisk cited laughter as a basis for striking only one other venire member, also African American. And Fisk never questioned Pickett about his laughter, another indication that this reason may be pretextual, as more fully explained above. While Pickett's laughter appears at first blush to be a plausible, race-neutral reason for striking him, when we examine the totality of the circumstances (including

Fisk's strike of Daigle),[14] we cannot agree that Pickett's race was irrelevant. *Powers,* 813 S.W.2d at 491 (holding that equal protection is denied if "race is a factor" in a peremptory challenge).

In concluding that Fisk's reasons for striking Pickett were non-pretextual, the court of appeals erroneously relied on Pickett's statements during voir dire that he had been the victim of racial discrimination. 187 S.W.3d at 582–83. While Pickett did make such an assertion, Fisk did not cite Pickett's experience with discrimination as a basis for the strike. Thus, the court of appeals should not have relied upon these statements as supporting Pickett's strike. *See Miller–El II,* 545 U.S. at 252, 125 S.Ct. 2317 (lawyer must "state his reasons as best he can and stand or fall on the plausibility of the reasons he gives"; if stated reason does not hold up, it is immaterial that "an appeals court can imagine a reason that might not have shown up as false"). In sum, none of Fisk's reasons for striking Pickett can "reasonably be accepted." *Miller–El II,* 545 U.S. at 247, 125 S.Ct. 2317.

## VI

### Conclusion

Despite its laudable goal, *Batson* has been difficult to enforce. In *Miller–El II,* decided a year after this case was tried, the Supreme Court noted that *Batson's* "individualized focus came with a weakness

claim that she was "one of the jurors who had the strongest reactions to the subject of the use of the 'N' word." In fact, Harts never verbally responded to any of the questions regarding the n-word, including Fisk's direct questions about whether Blanton's use of the n-word would impact the venire's consideration of the evidence. To the extent Fisk is relying on nonverbal conduct, merely stating that Harts had a strong "reaction" to the n-

word is insufficient, for the reasons outlined above.

14. *See Snyder,* 552 U.S. at ——, 128 S.Ct. 1203 (noting that "all of the circumstances that bear upon the issue of racial animosity must be consulted," and "if there [are] persisting doubts as to the outcome, a court would be required to consider the strike of [one challenged juror] for the bearing it might have upon the strike of [another]")

of its own owing to its very emphasis on the particular reasons a prosecutor might give." *Miller–El II*, 545 U.S. at 239–40, 125 S.Ct. 2317.

> If any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than *Swain*. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence, *Batson's* explanation that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination.

*Id.* at 240, 125 S.Ct. 2317 (quoting *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712). Miller–El I's "totality of the circumstances" analysis places a heavy burden on trial courts, and we acknowledge that some of the factors that Court examined—most especially the comparative juror analysis—are perhaps more easily reviewed on appeal, with the benefit of a transcript from which such comparisons may most accurately be drawn. But without Miller-El II's searching inquiry into the basis of the challenged strikes, Batson would become a "mere exercise in thinking up any rational basis." *Id.* at 252, 125 S.Ct. 2317.

 Unlike *Miller–El II*, there is no evidence here of a historical pattern of excluding blacks from juries. But *Miller–El II* made it clear that the five factors it considered were neither exhaustive nor mandatory; courts must consider "all relevant circumstances" when reviewing *Batson* challenges. *Miller–El II*, 545 U.S. at 240, 125 S.Ct. 2317 (quoting *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712); *see also Snyder*, 552 U.S. at ——, 128 S.Ct. 1203 ("In *Miller–El v. Dretke*, the Court made it clear that in considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances . . .

must be consulted."). And here, the relevant circumstances include many of those pertinent in Miller–El II, including a statistical disparity and unequal treatment of comparable jurors.

 We acknowledge that peremptory strikes, often based on instinct rather than reason, can be difficult to justify. *Miller–El II*, 545 U.S. at 252, 125 S.Ct. 2317. The trial lawyer's failure to do so here does not suggest personal racial animosity on his part. *See, e.g.*, Antony Page, *Batson's Blind Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L.Rev. 155, 160–61, 184 (2005) (noting that "research has compellingly demonstrated the existence of unconscious race- and gender-based stereotyping"). A zealous advocate will seek jurors favorably inclined to his client's position, and race may even serve as a rough proxy for partiality. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 139, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (Rehnquist, J., dissenting) (noting that factors like race are often a "proxy" for potential juror bias). But whatever the strategic advantages of that practice, the Constitution forbids it.

The concurrence suggests that we ascribe sinister motives to Fisk's counsel. The question presented, however, is not whether this particular advocate harbors ill will, but whether the record explains, on neutral grounds, a statistically significant exclusion of black jurors. It is not enough, under the Supreme Court precedent we examine here, that the lawyer be pure of heart. We assume that he is. Our holding depends not on the personal sentiments of the advocate but on the state of the record. *Miller–El II* and *Snyder* emphasize that *Batson's* promise cannot be fulfilled if its requirements may be satisfied merely by ticking off a race-neutral explanation from a checklist.

After examining the totality of the circumstances, we conclude that race explains Fisk's strikes of Daigle and Pickett better than any other reason, and the trial court abused its discretion in failing to sustain Davis's *Batson* challenge. *Miller–El II*, 545 U.S. at 266, 125 S.Ct. 2317; *Powers*, 813 S.W.2d at 491. We reverse in part[15] the court of appeals' judgment and remand the case to the trial court for a new trial. TEX.R.APP. P. 60.2(d).

Justice BRISTER delivered a concurring opinion, in which Justice MEDINA joined as to Part III.

Justice BRISTER, joined by Justice MEDINA as to Part III, concurring.

I disagree with the Court's conclusion that defense counsel's peremptory strikes were racially motivated. Neutral reasons were given for them but were not properly preserved, in part because the rules changed during this appeal. The difference between not having neutral reasons and merely not preserving them is no technicality; charges of discrimination (like discrimination itself) can have far-reaching effects, including use in future trials.[1]

If we are to blame rather than just decide, we ought to be more even-handed.

The plaintiff's strikes here were even more "remarkable" than the defendant's, as plaintiff's counsel used all six of her peremptory strikes (100 percent) to exclude white males.[2] In Harris County, where this case was tried, every racial group is a minority.[3] The Court's extra effort to censure one counsel after disregarding his explanations on procedural grounds is simply too one-sided.

I agree that peremptory strikes provide an opportunity for discrimination. But they also provide an opportunity to accuse an opponent of discrimination and get a new trial if the first one turns out badly. As these strikes have outlived their original purpose, it is time we did something about them. Rather than using this case as an opportunity to disparage one attorney, I would use it as an opportunity to discontinue a practice inherently based on stereotypes. As the Court misses that opportunity, I concur only in the judgment.

## I. "Guilty" or "Not Proven"?

Davis established a prima facie *Batson* violation by showing that 5 of Fisk's 6 strikes were used against African–Americans.[4] But disproportionate impact alone

15. In the trial court, Davis unsuccessfully moved for sanctions against Fisk, and the court of appeals affirmed the trial court's order. Davis does not challenge that portion of the court of appeals' judgment.

1. See *Miller–El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("*Miller–El II*") (holding discrimination could be inferred from policies that existed decades earlier in Dallas County District Attorney's office, as discrimination may be inferred from "all relevant circumstances" including "look[ing] beyond the case at hand").

2. One of these six had a Hispanic surname, but identified his race on his juror card as "white."

3. See U.S. Census Bureau, State & County Quickfacts, *available at* http://quic kfacts.census.gov/qfd/states/48/48201.html (reporting 2006 demographic figures for Harris County, Texas as: Hispanic/Latino 38.2%, White non-Hispanic 36.9%, Black 19.0%, Asian 5.4%).

4. *Miller–El v. Cockrell*, 537 U.S. 322, 342, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("*Miller–El I*") ("[S]tatistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors."); *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ("For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.").

does not violate *Batson*.[5] Instead, it shifts the burden to the striking party to "come forward with a neutral explanation."[6] Fisk did so, but procedural errors require us to disregard those explanations with respect to at least one juror, which is all it takes.[7]

Fisk's first explanation for striking Patrick Daigle was nonverbal conduct suggesting he strongly favored punitive damages. But two years after this trial occurred, the Supreme Court held in *Snyder v. Louisiana* that a juror's nonverbal conduct can support a strike only if the trial judge expressly states that the *Batson* challenge was denied on that basis.[8] The trial judge here expressly denied the challenge regarding Michael Pickett based on nonverbal conduct, but he did not say the same regarding Daigle. While the nonverbal conduct might have been an entirely valid and neutral explanation for this strike at the time of trial, we cannot consider it now because the trial judge's findings do not comply with the new rule.

Fisk's second explanation was that Daigle did not seem sufficiently skeptical about the potential for racial discrimination by his employer, Continental Airlines. Nothing in the written record supports this explanation. Perhaps it was based on nonverbal conduct, but if so it again cannot

count in the absence of an express trial court finding.

Fisk's final explanation is that Daigle said he had been the victim of job discrimination—the precise claim made by the plaintiff. It goes without saying that peremptory strikes are often used against jurors whose personal experiences (as opposed to their race or gender) might cause them to identify with an opposing party.[9] But this ground was first stated after trial, not during the *Batson* hearing. As a party must come forward with a neutral explanation during the *Batson* hearing, we cannot consider this ground either.

Rather than acknowledging that Fisk's counsel may have had perfectly neutral reasons but simply failed to preserve them (in part because the rules for doing so changed), the Court seems to go out of its way to heap up arguments that Fisk's strikes were racially motivated. In fact, there is little reason to doubt the neutral explanations by Fisk's counsel, except that those grounds were not properly preserved.

It is one thing to hold that an attorney failed to prove a neutral explanation, and quite another to hold that an attorney excluded black jurors solely because of their race. On this record, the former is established but the latter is not. Davis is

**5.** *See Hernandez v. New York*, 500 U.S. 352, 359–60, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("[A]ction will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.") (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

**6.** *Batson*, 476 U.S. at 97, 106 S.Ct. 1712 ("Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for

challenging black jurors."); *see also Miller–El II*, 545 U.S. at 252, 125 S.Ct. 2317.

**7.** *Snyder v. Louisiana*, —— U.S. ——, ——, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

**8.** *Id.* at ——, 128 S.Ct. 1203.

**9.** In fact, Daigle's discrimination complaint was unusual, as it involved the "havoc" that resulted when his non-black co-supervisors found out he was making more money than they were. But his perception of himself as a victim of discrimination provided a neutral reason for a strike.

entitled to a new trial because Fisk did not carry its burden. But I would not be so certain that we know defense counsel's true motives.

## II. Scrutinizing Jurors' Shrugs

The Court also goes overboard by prohibiting peremptory strikes based on a juror's nonverbal conduct unless (1) the conduct is identified on the record "with some specificity," and (2) the juror is questioned about it.[10] Neither has ever been required by any constitutional or procedural rule, and both exalt appellate-level clarity over trial-level reality.

The United States Supreme Court has never imposed these restrictions. For example, in *Rice v. Collins,* the Court upheld an explanation that a juror "rolled her eyes" during voir dire, even though the trial judge did not see it and no one questioned the juror about it.[11] In *Snyder v. Louisiana,* there again was no questioning about physical conduct that "looked very nervous to me"; the Court rejected this explanation only because the trial judge did not expressly adopt it.[12] If the Constitution requires precise specification and explicit interrogation about nonverbal reactions, it is odd that the Supreme Court has never said so.

Nor has the Court of Criminal Appeals, despite what the Court claims. *Hill v. State* cannot support such a claim, as the reason our sister court rejected the explanation that "He's black, he's male, and I didn't like the way he responded to my questions,"[13] had nothing to do with body language. The actual rule in Texas crimi-

nal courts is that claims about a juror's nonverbal conduct are taken as true if: (1) the conduct could not have been missed, and (2) opposing counsel would have denied the claim had it been untrue.[14] Here, no one denied at trial, or denies even today, that the struck jurors reacted just as Fisk's counsel said they did. Davis's only response has been that the conduct was "not supported by the record"—which of course nonverbal conduct rarely is. If we adopt our sister court's rules, not only is Fisk's explanation of the jurors' nonverbal conduct sufficiently specific, it is (as the court of appeals held) established as a matter of law.[15]

The Court's new requirements are completely impractical. Most of us recognize surprise, disgust, or eagerness when we see it, but giving a "clear and reasonably specific" explanation of which muscles twitched is another matter. Yet the Court says attorneys must publicly announce any reaction they saw on the record, question the juror about it, allow opposing counsel to rebut, and obtain a ruling that the conduct occurred. This sounds like a good way to antagonize jurors; any attorney who complies can expect exchanges like the following:

> Counsel: Juror No. 7, I notice that you are yawning. Why is that?
>
> Juror No. 7: I wasn't yawning.
>
> Counsel: Judge, I want the record to reflect that Juror No. 7 was yawning, even though he denies it.
>
> Opposing Counsel: No he was not.
>
> Counsel: Yes he was. Judge, may I have a ruling?

---

10. 268 S.W.3d 518, 527.

11. 546 U.S. 333, 339, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

12. —— U.S. ——, ——, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

13. 827 S.W.2d 860, 869 (Tex.Crim.App.1992).

14. *Thieleman v. State,* 187 S.W.3d 455, 458 (Tex.Crim.App.2005).

15. 187 S.W.3d 570, 584.

Court: I wasn't watching him, so your request is denied. And now you can't strike Juror No. 7, even though you have thoroughly embarrassed him.

This will never work. If the Court wants to prohibit peremptory strikes based on nonverbal conduct, it should say so directly rather than imposing an impractical test that does so indirectly.

## III. Ending Peremptory Strikes

Yet the Court's opinion does not go far enough to ensure every American citizen the opportunity to sit on a jury.

If the composition of a jury is a matter of pure chance, neither litigants nor jurors can complain that the system has treated them unfairly.[16] But peremptory strikes allow litigants to change the complexion of a jury, which is why they provoke charges and suspicions of discrimination. The only way to reduce or eliminate discrimination and suspicion is to reduce or eliminate these strikes.

Texas allows more peremptory strikes than most of our sister states.[17] Twenty years after *Batson*, it is now clear we

cannot always detect how many of those strikes are racially motivated, no matter how hard we try. Nor can we guarantee equal protection if we focus only on cases like this one where "too many" minority jurors were struck.[18] In the meantime, we are doing neither the jury system nor racial harmony any favors by encouraging lawyers to accuse each other of racial motives so they can get a second trial if they lose the first one.

Haphazard success in removing race from jury selection might be the best we could expect if peremptory strikes were absolutely necessary for a fair and impartial jury. But they are not. Peremptory strikes were an important part of older jury systems in which panels were not randomly selected. Each side in ancient Rome could strike 50 jurors because each side got to propose 100 jurors for the panel.[19] Parties needed peremptory strikes in early Texas because potential jurors were hand-picked by the local sheriff,[20] and later by jury commissioners,[21] and tended to reflect a limited part of the community.[22]

---

**16.** *See Holland v. Illinois*, 493 U.S. 474, 499, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (Marshall, J., dissenting) ("Public confidence is undermined by the appearance that the government is trying to stack the deck against criminal defendants and to remove Afro-Americans from jury service solely because of their race. No similar inference can be drawn from the operations of chance.").

**17.** *Cortez ex rel. Estate of Puentes v. HCCI–San Antonio, Inc.*, 159 S.W.3d 87, 90 (Tex.2005).

**18.** *See Batson*, 476 U.S. at 105, 106 S.Ct. 1712 (Marshall, J., concurring) ("Prosecutors are left free to discriminate against blacks in jury selection provided that they hold that discrimination to an 'acceptable' level.").

**19.** *See id.* at 119, 106 S.Ct. 1712 (Burger, C.J., dissenting).

**20.** *See Gulf, C. & S.F. Ry. Co. v. Greenlee*, 70 Tex. 553, 8 S.W. 129, 130 (1888) ("[T]he

leading object of our present jury law was to avoid the evils resulting from the summoning of juries by sheriffs....").

**21.** *See* Act approved Aug. 1, 1876, 15th Leg., R.S., ch. 76, §§ 4, 7, 1876 Tex. Gen. Laws 78, 79 *reprinted in* 8 *H.P.M.N. Gammel, The Laws of Texas 1822–1897*, at 914, 915 (Austin, Gammel Book Co. 1898), available at [http://texashistory.unt.edu/ permalink/meta–pth–6731:916?search=peremptory]. *See also* JEFFREY ABRAMSON, WE, THE JURY: THE JURY SYSTEM AND THE IDEAL OF DEMOCRACY 99 (1994) (noting that the federal courts used the "key man" system of selecting notable citizens who were "men of recognized intelligence and probity" as recently as 1960).

**22.** *See Swain v. Alabama*, 380 U.S. 202, 207, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Joanna Sobol, Note, *Hardship Excuses and Occupational Exemptions: The Impairment of the*

But today jury venires are randomly selected,[23] and anyone who is related to, interested in, or biased against a party or case is disqualified.[24] It is hard to see why litigants need to remove *half* of the *unbiased* jurors to get an impartial jury—especially when peremptories are based mostly on instinct, intuition, and inference.[25] This is especially true in civil cases, as a fractious juror or two cannot keep the rest from rendering a verdict.[26]

There is no constitutional right to peremptory strikes.[27] Indeed, recent cases suggest the opposite may be true, as several justices have already concluded.[28] The Equal Protection Clause protects citizens from arbitrary and capricious state action.[29] In 1991 peremptory challenges were declared to be "state action";[30] they have always been recognized as "arbitrary and capricious" by their very nature.[31] As Justice Scalia has written, "[t]o affirm that the Equal Protection Clause applies to strikes of individual jurors is effectively to abolish the peremptory challenge."[32]

A majority of this Court could curb peremptory strikes today, as they stem entirely from our Rules of Civil Procedure.[33] The reason we hesitate to do so is that lawyers are tenaciously protective of them, believing they can use these strikes to mold a favorable jury.[34] Study after study

*"Fair Cross–Section of the Community"*, 69 S. CAL. L. REV. 155, 161 n. 17 (1995).

**23.** *See* TEX. GOV'T CODE § 62.004.

**24.** *See* TEX. GOV'T CODE § 62.105.

**25.** Because each side gets six peremptory strikes against a twelve person jury, *see* TEX.R. CIV. P. 233, the two sides can remove half of the eligible jurors.

**26.** *See Powers v. Ohio*, 499 U.S. 400, 425, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (Scalia, J., dissenting) ("In a criminal-law system in which a single biased juror can prevent a deserved conviction or a deserved acquittal, the importance of [peremptory challenges] should not be minimized.").

**27.** *See Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) ("[P]eremptory challenges are not constitutionally protected fundamental rights.... This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial."); *Batson v. Kentucky*, 476 U.S. 79, 91, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ("[T]he Constitution does not confer a right to peremptory challenges"); *Tamburello v. Welch*, 392 S.W.2d 114, 117 (Tex.1965) (noting that peremptory challenges in Texas are provided solely by rules of civil procedure).

**28.** *See Rice v. Collins*, 546 U.S. 333, 344, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (Breyer, J., concurring); *Batson*, 476 U.S. at 102–03, 106 S.Ct. 1712 (Marshall, J., concurring) ("The decision today will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely.").

**29.** *See, e.g., Vieth v. Jubelirer*, 541 U.S. 267, 320–21, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004); *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, W. Va.*, 488 U.S. 336, 344, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989); *Baker v. Carr*, 369 U.S. 186, 207, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

**30.** *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 622, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

**31.** *Lewis v. United States*, 146 U.S. 370, 378, 13 S.Ct. 136, 36 L.Ed. 1011 (1892) (quoting 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 346 (1769)); *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (same).

**32.** *Powers v. Ohio*, 499 U.S. 400, 425, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (Scalia, J., dissenting).

**33.** *See* TEX.R. CIV. P. 223, 232, 233.

**34.** *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 750 (Tex.2006) ("Peremptory challenges allow parties to reject jurors they perceive to

has shown this belief to be unfounded.[35] But even if it were true, that reason is not enough: "Peremptory strikes are not intended . . . to permit a party to 'select' a favorable jury." [36]

All these problems—discriminating against minorities, disrupting trial, and discarding perfectly good jurors—are particularly acute in Texas. Whether because of the state's diversity, the generous allowance of peremptory strikes, or something else, *Batson* challenges are far more frequent here than anywhere else. A recent Westlaw search for state court cases citing to *Batson* yields:

- 4 cases from Idaho,
- 17 from Alaska,
- 43 from Colorado,
- 58 from Oklahoma.
- 74 from Minnesota,
- 90 from Florida,
- 181 from Pennsylvania,
- 342 from Illinois,
- 676 from California, and
- 1,364 cases from Texas.

More than any other state, we in Texas must consider whether peremptory strikes are worth the price they impose.

---

be unsympathetic to their position."); *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 919 (Tex.1979) (noting that peremptory challenges "are intended to permit a party to reject certain jurors based upon a subjective perception that those particular jurors might be unsympathetic to his position") (emphasis omitted); *Tamburello v. Welch*, 392 S.W.2d 114, 117 (Tex.1965) (noting that peremptory challenges are used to ensure "that the controversy is decided by a jury whose members are not predisposed by reason of temperament or prior experience to look with disfavor upon his side of the case"); *see also J.E.B. v. Alabama*, 511 U.S. 127, 160, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (Scalia, J., dissenting) (noting that peremptory strikes reflected "each side's desire to get a jury favorably disposed to its case"); *Edmonson*, 500 U.S. at 642, 111 S.Ct. 2077 (O'Connor, J., dissenting) ("[A] peremptory strike is a traditional adversarial act; parties use these strikes to further their own perceived interests. . . .").

**35.** *See* Reid Hastie, *Is Attorney–Conducted Voir Dire An Effective Procedure for the Selection of Impartial Juries?*, 40 AM. U.L.REV. 703, 722 (1991) ("[A]ttorney-conducted voir dire is not an effective procedure for selection of impartial juries. Although none of the empirical studies is perfect, all evidence demonstrates a consistent lack of impressive attorney performance in this regard. Attorneys disagree substantially about what information to rely on and which jurors to select, and consistently produce low levels of accuracy in judging juror verdict preference prejudices."); Norbert L. Kerr et al., *On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial Pretrial Publicity: An Empirical Study*, 40 AM. U.L. REV. 665, 699 (1991); Solomon M. Fulero & Steven D. Penrod, *The Myths and Realities of Attorney Jury Selection Folklore and Scientific Jury Selection: What Works?*, 17 OHIO N.U.L.REV. 229, 250 (1990); Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts*, 56 U. CHI. L.REV. 153, 232 (1989); Hans Zeisel & Shari Seidman Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court*, 30 STAN. L.REV. 491, 517 (1978); Michael J. Saks, *The Limits of Scientific Jury Selection: Ethical and Empirical*, 17 JURIMETRICS J. 3, 21–22 (1976); Dale W. Broeder, *Voir Dire Examinations: An Empirical Study*, 38 S. CAL. L.REV. 503, 505–06 (1965).

**36.** *Hyundai*, 189 S.W.3d at 750; *Cortez v. HCCI–San Antonio, Inc.*, 159 S.W.3d 87, 94 (Tex.2005) ("Litigants have the right to an impartial jury, not a favorable one.").