In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00068-CV

                                                ______________________________

 

 

 

          IN THE INTEREST OF J.A.W. AND
S.P.W., MINOR CHILDREN

 

 

 

                                                                                                  


 

 

                                       On Appeal from the 307th
Judicial District Court

                                                             Gregg County, Texas

                                                      Trial Court No. 2008-168-DR

 

                                                    
                                              

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter








                                                     MEMORANDUM 
OPINION

 

            This
is a joint appeal from termination of parental rights to two children, J.A.W.
(the older girl) and S.P.W. (the infant). 
The parental rights of the mother (Princess) of both children, the
father (Brandon) of S.P.W., and the father (Kelly) of J.A.W. were terminated,
and the relief sought in connection with conservatorship and visitation privileges
to the maternal grandmother (Patricia) was denied.  Brandon, Princess, and Patricia all filed
appeals; Kelly did not.  Separate briefs
were filed by each party, albeit with substantial overlap among the issues
raised.  Having found the evidence sufficiently
supports the judgment and no other reversible error, we affirm the judgment of
the trial court.

I.          GENERAL FACTS

            Princess
had a relationship with Kelly that resulted in the birth of J.A.W.  Shortly thereafter, she lived with Brandon
for a time, and S.P.W.’s birth resulted. 
While she and Brandon lived together, there is evidence that he
repeatedly assaulted her, resulting in arrests, emergency room visits for
Princess, and finally resulting in Brandon’s current imprisonment.  Brandon had also previously, during the
lifetime of the child, been incarcerated in a state jail facility for six
months after his revocation of community supervision on a felony theft
conviction.  Both children stayed at
different times with Princess’ mother, Patricia, and with Brandon’s grandmother
Nelderine. 

            Princess
met Brandon in 2005 and lived with him in Nelderine’s home.  Brandon beat her on three specific occasions
that resulted in hospital visits, the first time in April 2007, while she was
pregnant, and the last time in January 2008, using a closet pole as a
weapon.  The last time, she was
hospitalized.  She nevertheless returned
to live with Brandon.  Princess’ full
scale IQ is fifty-four.  The evidence
shows that after S.P.W. was born, she stayed with Patricia or Nelderine and
that Brandon had not provided anything for the child.  After the assaults, Patricia had taken steps
to get J.A.W. and her pregnant daughter out of Nelderine’s home, and by
December, both were living with Patricia. 
That did not last, however, as Princess took the child back to Nelderine’s
home shortly thereafter—where she could rejoin Brandon after his release from
jail. 

            The
Texas Department of Family and Protective Services (TDFPS) became involved
following the December 2007 beating, during the short time that Princess was
living with her mother.  TDFPS was in the
process of creating a “plan,” and while doing so, discovered that Princess had
moved back in with Nelderine—because her own mother was too strict and because
she wanted to be with Brandon.[1]  After Princess left her mother’s home and
returned to Brandon, TDFPS directed that the children should be placed with
Patricia.  TDFPS arranged meetings, which
Brandon walked out of and which Princess attended only briefly.  

            In
the next stage of the proceedings, the children had been living with Patricia
for several months, until mid–April 2007, when TDFPS received a report that
Patricia was using drugs.  Patricia
admitted using marihuana, and (contrary to a court order directing that Princess
could not have unsupervised contact with her children) had left the children
with Princess while she was doing so. 
TDFPS removed the children from Patricia’s home at that time and sent
them to foster care.  The evidence also
shows that TDFPS found Patricia’s home to be appropriate, clean, etc., and that
drug tests of Patricia after the April 2007 incident were negative. 

            Brandon
was incarcerated when S.P.W. was about five months old, and at the time of
trial, he had completed twenty-two months of a six-year felony sentence for
family violence against Princess.  The
likelihood of Brandon’s release on parole was dubious; he had four prior
convictions for assault and while incarcerated, he attacked a guard, which
caused him to lose one year of good conduct time.  There is no evidence that either child was
ever injured by Brandon.

II.        STANDARD OF REVIEW

            The
standard of review in parental rights termination proceedings is clear and
convincing evidence.  Tex. Fam. Code Ann. § 161.001 (Vernon Supp.
2009); In re J.F.C., 96 S.W.3d 256,
263 (Tex. 2003).  The evidence is clear
and convincing when the proof is such that it produces in the mind of the trier
of fact a firm belief or conviction of the truth of the allegations sought to be
established by the State.  In re C.H., 89 S.W.3d 17, 25–26 (Tex. 2002);
In re A.W., No. 06-07-00118-CV, 2008
WL 360825 (Tex. App.—Texarkana Feb. 12, 2008, no pet.) (mem. op.).

            In
reviewing the legal sufficiency of the evidence, we view all the evidence in a
light most favorable to the finding to determine whether a reasonable trier of
fact could have formed a firm belief or conviction that its finding was
true.  Tex.
Fam. Code Ann. § 101.007 (Vernon 2008); J.F.C., 96 S.W.3d at 266; C.H.,
89 S.W.3d at 25.  Looking at the evidence
in the light most favorable to the judgment means we must assume the
fact-finder resolved disputed facts in favor of its finding if a reasonable
fact-finder could do so.  A corollary to
this requirement is that a court should disregard all evidence that a reasonable
fact-finder could have disbelieved or found to have been incredible.  J.F.C.,
96 S.W.3d at 266.

            In
reviewing for factual sufficiency, we are to give due consideration to evidence
the fact-finder could reasonably have found to be clear and convincing––whether
it is such as to allow a fact-finder to reasonably form a firm belief or
conviction about the truth of the State’s allegations.  If, on review of the entire record, we
conclude that the disputed evidence that a reasonable fact-finder could not
have credited in favor of the finding is so significant that a fact-finder
could not have reasonably have formed a firm belief or conviction, then the
evidence is factually insufficient.  Id.

            We
also acknowledge that sufficient proof of one statutory termination ground,
together with the finding that termination is in the best interest of the
child, is sufficient to support a termination order.  In re
A.V., 113 S.W.3d 355, 361 (Tex. 2003).

III.       PRINCESS

            We
first address Princess’ argument that there is no or insufficient evidence to
support a finding that she knowingly placed or knowingly allowed the children
to remain in conditions or surroundings that endanger the physical or emotional
well-being of the child. 

            A.        Grounds for Termination 

            The jury charge listed five
different factors that are set out in the Texas Family Code as reasons to
justify termination and instructed the jury that if it found that any one of
them had occurred (and if in the best interest of the child), it could
terminate her rights.[2]
 

            Thus,
the jury had multiple grounds on which it could have found termination
appropriate, with no specificity as to which was actually utilized.  Accordingly, the trial court entered an order
that listed each reason set out in the charge as a reason for termination.  Princess is required to address each possible
reason for the verdict on appeal.

            If
a parent abuses or neglects the other parent or children, that conduct can be
used to support a finding of endangerment even against a child who was not yet born
at the time of the conduct.  In re J.O.A., 283 S.W.3d 336, 346 (Tex.
2009); In re W.J.H., 111 S.W.3d 707,
716 (Tex. App.—Fort Worth 2003, pet. denied). 
It is not necessary that the offending conduct be directed at the child
or that the child actually suffers injury. 
Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987).  If the
evidence shows a course of conduct which has the effect of endangering the
physical or emotional well-being of the child, a finding under Section 161.001(1)(E)
is supportable.  Id. at 534; In re C.E.K., 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.).  In considering whether a relevant course of
conduct has been established, a court may properly consider evidence of conduct
that occurred both before and after a child’s birth.  In re
C.A.B., 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.); In re S.T., 263 S.W.3d 394, 401–02
(Tex. App.—Waco 2008, pet. denied).  In
addition, a court may consider evidence establishing that a parent continued to
engage in endangering conduct after the child’s removal by TDFPS or after the
child no longer was in the parent’s care, thus showing the parent continued to
engage in the course of conduct in question. 
See C.A.B., 289 S.W.3d at 883;
Smith v. Sims, 801 S.W.2d 247, 249–50
(Tex. App.––Houston [14th Dist.] 1990, no writ).

            The
evidence set out above shows that Princess kept company with a man who beat her
repeatedly and that she took her oldest child into harm’s way.  The evidence also shows that during several
of the beatings, she was pregnant with the younger child and feared injury to
the fetus as a result of at least one of the beatings—and yet later returned to
live with Brandon.  TDFPS was involved
with the family by that point, and Princess did not go to one meeting they had
arranged with her, Brandon, and grandparents because she had injuries to her
face—and then hid in Brandon’s apartment from the caseworker when she came by
to check on her to see why she had not come to the meeting.  There is evidence the older child was with
her part of the time she was living with Brandon.  There is no evidence that Brandon ever beat
the children or harmed them physically in any other way.  However, it is also clear that his actions in
beating the mother would certainly injure the emotional well-being of the
child.  The fact that Princess chose for
part of that time to leave J.A.W. with her mother is not dispositive and there
is nothing to indicate any lasting change in Princess’ behavior.  We acknowledge that she will not be living
with Brandon again, at least for some time, as he is now in prison.  Nevertheless, she did choose to place herself
in clear and repetitive danger, and for a portion of that time, J.A.W. was also
exposed to such conditions.  There was
also evidence that S.P.W., after her birth, was taken into the situation, as
Princess was still living with Brandon, and the child was taken back and forth
to spend time with her—and then returning to Patricia’s house.  

            This
is, standing alone, sufficient evidence to allow a fact-finder to find by the
requisite clear and convincing standard that Princess had knowingly placed or
knowingly allowed the children to remain in conditions or surroundings that
endanger the physical or emotional well-being of the child—as to both
children.  Because only one statutory
ground for termination under Section 161.001(1) is necessary to support a
judgment of termination, we need not address Princess’ challenges to the
sufficiency of the evidence supporting the alternative findings.  See
Tex. R. App. P. 47.1; In re J.N., 301 S.W.3d 429, 433 (Tex.
App.—Amarillo 2009, pet. denied); In re
D.M., 58 S.W.3d 801, 813 (Tex. App.––Fort Worth 2001, no pet.).

            B.        Best
Interest of the Children 

            Princess
also argues that the evidence is insufficient because the TDFPS did not prove
that termination of her parental rights was in the best interests of the
children.  In reviewing the sufficiency
of the evidence to support the second prong, we apply the nonexclusive factors
found in Holley v. Adams, 544 S.W.2d
367, 371–72 (Tex. 1976).  Those factors
include:  (1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future; (3)
the emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the plans for the
child by these individuals; (6) the stability of the home; (7) the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and (8) any excuse for the acts or omissions
of the parent.  Id.

            The
Holley factors, however, are not
exhaustive, and no single consideration is controlling.  In re
A.B., 269 S.W.3d 120, 126 (Tex. App.––El Paso 2008, no pet.).  Nor is a fact-finder required to consider all
of them.  Holley, 544 S.W.2d at 372. 
Undisputed evidence of just one factor may be sufficient to support a
finding that termination is in the best interest of a child.   C.H., 89 S.W.3d at 27; M.C. v. Tex. Dep’t of Family &
Protective Servs., 300 S.W.3d 305 (Tex. App.—El Paso 2009, pet. denied).  On the other hand, the presence of scant
evidence relevant to each Holley
factor will not support a finding.  C.H., 89 S.W.3d at 27; M.C., 300 S.W.3d 305; A.B., 269 S.W.3d at 126.

            There
is little testimony about the desires of J.A.W. beyond a statement that at one
point, she wanted to go home and see her grandmother.  Testimony about her behavior indicated that
J.A.W. had problems with aggressive and angry behavior, but seemed to have
bonded well with the foster parents. 
J.A.W. is seven years old.  The
infant is too young to express desires. 
This factor is effectively neutral as to both.   

            As
to the emotional and physical needs of the child now and in the future, there
is evidence that J.A.W. had a lack of emotional control and exhibited
aggressive behavior at times.  As
presented, that evidence is not convincing as to anything beyond the fact that
she is a child.  However, this factor
merges in this instance with the next one based on possible emotional and
physical danger to the children now and in the future.  The problem is not J.A.W.’s lack of control
and her decision-making frailties; it is Princess’ lack of control and her poor
choices.  Domestic violence, want of
self-control, and propensity for violence may be considered as evidence of
endangerment.  In re J.I.T.P., 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.]
2003, no pet.).  

            The
cited evidence of Princess’ insistence of remaining in a relationship with a
man who hospitalized her, combined with the lack of any indication of a change
in her behavior shows that she is a probable danger, both to the physical and
emotional aspects of the children. 
Finally, the need for permanence is a paramount consideration for the
child’s present and future physical and emotional needs.  In re
C.J.F., 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, no pet.); In re S.Z.G, No. 12-02-00081-CV, 2003 WL
21771759, at *6 (Tex. App.—Tyler July 31, 2003, pet. denied) (mem. op.).  We also note that she effectively abandoned
the children, moving out of town, and failing to visit or otherwise contact
them for the six months before the trial. 
Her reason, as she explained, was because she believed she could never
get the children back anyway.  These
factors weigh in favor of the TDFPS’s position.

            The
evidence about Princess’ parental abilities is of a woman with low
intelligence, who has little focus on the care of her children, and whose
behavior shows a focus on herself.  She
admitted at trial that she was not able to take care of her children by
herself, but indicated that she would be willing to attend parenting classes.  She has no apparent ability to care for her
children herself, and wants the children returned to her family at large, with
the stated idea that her mother would raise them.  This shows a degree of understanding of her
own weaknesses.  Although this is
commendable, it is not equivalent to showing that Princess has the ability to
act as a parent.  This factor also weighs
in favor of the TDFPS’s position.

            So
far as plans for the children by these individuals, there is nothing other than
turning the children over to the grandmother to raise.  Regarding the stability of the home—the
mother has none, and lives either with other individuals or with her own
mother.  Both of those factors are
somewhat in favor of the TDFPS’s position. 


            There
is nothing that indicates the existing parent-child relationship is not a “proper”
one.  This weighs in favor of Princess’
position.  Finally, there is no real
excuse proffered for the acts or omissions of the parent as described
above.  At best, this is neutral.

            Based
on all of these factors, we find the evidence legally and factually sufficient
to support the termination of Princess’ parental rights.

            C.        Constitutional
Argument 

            Princess
also contends that the termination statutes are unconstitutional as applied
because they have denied her due process and due course of law—by restricting
the issues that can be preserved and raised on appeal.  This contention is directed at the
much-maligned “statement of points” that must be filed within an extraordinarily
short time frame and presented to the trial court before they can be considered
later by an appellate court in reviewing the termination proceeding.[3]  The TDFPS argues that we should reach none of
these arguments because she has been unable to show any issues that would have
been raised with effect, but for the unconstitutional restriction.  

            An
“as applied” constitutional challenge is waived if not raised at the trial
court level.  See In re L.M.I., 119 S.W.3d 707, 711 (Tex. 2003); In re R.B., 225 S.W.3d 798, 802 (Tex.
App.––Fort Worth 2007, no pet.); In re
B.S.W., 87 S.W.3d 766, 771–72 (Tex. App.—Texarkana 2002, pet. denied), overruled sub silentio, on other grounds,
A.V., 113 S.W.3d 355.  Princess raised her constitutional challenges
at the trial court level in her timely motion for new trial as well as in her
timely statement of points.  The trial
court heard argument on the issue at the hearing on the motion for new trial.  Thus, the issue has been preserved.  See In
re S.K.A., 236 S.W.3d 875, 887 (Tex. App.—Texarkana 2007), pet. denied, 260 S.W.3d 463 (Tex. 2008).

            As
we discussed in S.K.A., and as other
courts of appeals have stated, the statute contains the potential to create
constitutional violations.  The Fort
Worth court has held, in a carefully written and well-supported opinion, that
Section 263.405(i) 

is void because it
violates the Separation of Powers Clause of the constitution to the extent that
it forecloses our power to review issues properly preserved for appeal because
the statute unduly interferes with our substantive power as an appellate court
to rehear and determine issues on the merits that were decided in the court
below.  

 

In re D.W., 249 S.W.3d 625, 640 (Tex. App.—Fort Worth 2008, pet.
denied) (footnote omitted).

            However,
the facts in this case are distinctly different from those in D.W. 
In that case, the Fort Worth court was confronted with arguments that
had not been preserved below and had not been raised in the statement of
points.  Thus, the court reasoned, the
Legislature had attempted to eliminate the purpose for which courts of appeals
exist by creating stringent requirements with the sole aim of allowing the
TDFPS to avoid appellate review.  The
court was, by the terms of the statute, barred from considering the appellate
issues on constitutionality because those grounds were not alleged in the
statement of points and could not find any unconstitutionality harmless because
the statute stated that it may not “consider” that issue to determine whether
she would be entitled to prevail—“if the statute did not preclude us from
reviewing her complaint.”  Id. at 834.  

            In
our case, detailed issues were timely propounded to the trial court, and
counsel has suggested no other issues or arguments that he is prevented from
making because of the application of the statute.  The posture of this case is different from
that facing the Fort Worth court.   

            The
Texas Supreme Court has repeatedly stated that we should not delve into
constitutional issues if other grounds dispose of an appeal.  See
VanDevender v. Woods, 222 S.W.3d 430, 432 (Tex. 2007) (noting courts should
rest decisions on nonconstitutional grounds, if available, and not “wade into
ancillary constitutional questions”); In
re B.L.D., 113 S.W.3d 340, 349 (Tex. 2003) (“As a rule, we only decide
constitutional questions when we cannot resolve issues on nonconstitutional
grounds.”). 

            Applying
that general restriction, several appellate courts have held that due process
or separation of powers issues should not be addressed where there is no
showing that the operation of the challenged statute harmed the appellant.  See,
e.g., M.C., 300 S.W.3d at 315–16; Walker v. Tex. Dep’t of Family &
Protective Servs., No. 01-07-00867-CV, 2009 WL 1688469, at *7, 12 (Tex.
App.—Houston [1st Dist.] June 18, 2009, pet. denied); In re M.M.F., No. 2-08-014-CV, 2008 WL 5265033, at *7 (Tex.
App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.).

            Princess
does not identify any issues that we have not already addressed which were
preserved in the court below, but not raised herein, because those issues were
not included in her statement of points. 
She has not shown how the statute operated to deprive her of the ability
to raise certain challenges on appeal. 
Accordingly, we may not address the constitutional issues raised here,
and the contentions of error are overruled. 


IV.       BRANDON

            We
next turn to the arguments made by S.P.W.’s father, Brandon.  He contends we should reverse the termination
of his parental rights because there is legally and factually insufficient
evidence to support termination on any of the several grounds set out by the
court in the order of termination. 
Brandon further argues that termination was improper because the TDFPS
made no effort to give him an opportunity to work a service plan to regain
possession of his parental rights.  He
also raises the same constitutional arguments as those propounded by Princess,
with the addition of a contention that the determination of whether an appeal
is frivolous is also an unconstitutional usurpation of the function and
jurisdiction of the appellate courts. 
His final argument is a Batson[4]
claim.

            A.        Grounds

            We
first address the legal and factual sufficiency arguments, utilizing the
standards set out above.  Brandon argues
that the evidence is insufficient because it does not support the findings that
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endangered the child’s physical or emotional well-being and
engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangered the child’s physical or emotional well-being.  Tex.
Fam. Code Ann. § 161.001(1)(D), (E).

            As
set out above, Brandon is presently incarcerated for beating Princess.  The evidence indicates he did so on several
occasions, quite severely.  As we have
previously noted, endangerment does not require showing actual infliction of
injury on the children—and can include events that happened before the birth of
the child at bar.  See Wyatt v. Dep’t of Family & Protective Servs., 193 S.W.3d
61, 68 (Tex. App.—Houston [1st Dist.] 2006, no pet.); In re B.B., 971 S.W.2d 160, 166–69 (Tex. App.—Beaumont 1998, pet.
denied).  Domestic violence, want of
self-control, and propensity for violence may be considered as evidence of
endangerment.  J.I.T.P., 99 S.W.3d at 845; In
re S.M.L., 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no
pet.) (holding clear and convincing evidence existed that termination of father’s
parental rights was in child’s best interest where, among other factors, father
was incarcerated at time of termination hearing and had pattern of criminal and
violent conduct).  Cases also note that
incarceration is a legitimate factor for consideration on the issue of
endangerment.  Boyd, 727 S.W.2d at 533–34.

            Based
on the evidence of Brandon’s continuing and repetitive violent behavior, we
conclude that the evidence is both legally and factually sufficient to support
an order terminating his parental rights on this basis.  

            We
also note that he is presently imprisoned for a six-year term for the domestic
violence described above.  Under Tex. Fam. Code Ann. § 161.001(1)(Q),
and as also found by the trial court, Brandon’s parental rights could be
properly terminated based on his incarceration and concurrent inability to care
for S.P.W. for not less than two years from the date on which the petition was
filed, even considering the possibility of parole at some indefinable point in
the future.  See In re H.R.M., 209 S.W.3d 105, 109 (Tex. 2006).

            Brandon
next argues that his rights were unlawfully terminated because the TDFPS never
met its statutory duty to provide him with an opportunity to comply with a
service plan that might result in his regaining possession and conservatorship
of S.P.W.  Brandon argues that the TDFPS
had a duty to provide a plan and that by failing to do so, it had no authority
to then terminate his parental rights for the failure to comply with the
plan.  Tex.
Fam. Code Ann. § 263.101 (Vernon Supp. 2009) (requiring TDFPS to
file service plan within forty-five days after temporary order grants it
conservatorship).  In so doing, Brandon
attempts to import constitutional arguments suggesting that he was treated
differently from the mother, thus his right to equal protection under the law
or due process was also violated.  

            We
have found ample evidence supports the first ground for termination, so even if
Brandon’s argument was valid, the ultimate result would be the termination of
his parental rights.  Consequently, it is
unnecessary to address this issue.  The
contention of error is overruled.

            Brandon
also raises several contentions in which he argues, as has Princess, that the
statutes restricting appeal are unconstitutional as limiting the ability of
counsel to present reasoned points of error on appeal—because counsel has to draft
his statement of points before he even has a copy of the record for
review.  See Tex. Fam. Code Ann.
§ 263.405 (Vernon 2008).  That argument
has a considerable degree of validity. 
However, in this instance, as an admirably complete statement of points
was timely filed, and no additional issues are suggested that would be
unreviewable by this Court due to the statute, no harm can be shown, and as
above, we cannot address the argument on the merits.  Brandon also argues that the statute allowing
the trial court to determine whether the appeal is frivolous is a violation of
the constitutional separation of the branches of government.  See D.W.,
249 S.W.3d at 640.  In this instance,
however, the court did not find the appeal to be frivolous, so even though the
statute is suspect, Brandon has not been harmed by it, and his argument is thus
not properly before this Court for review. 
The contentions of error are overruled.

            B.        Best Interest of Child

            Brandon also argues that the
evidence does not prove it was in the best interest of the child for his
parental rights to be terminated.  We
have already set out the relevant standard of review for this argument.  As we noted above, Brandon is imprisoned for
beating the mother of the child, and the information provided at the trial
indicated that he had done so repeatedly. 
He has never provided care for S.P.W., has admitted providing no money
for S.P.W., and will be imprisoned for some years yet to come.  The jury’s determination is supported by
clear and convincing evidence.  The
contention of error is overruled. 

V.        PATRICIA

            The
maternal grandmother of both children has appealed from the judgment of the
trial court which denied her requests for managing conservatorship and access
to and possession of the children.  We
first address the issues attacking the jury’s findings on these matters.  The jury was asked the following questions:

Should Patricia Williams be appointed managing
conservator of the children?

 

. . . .

 

Should Patricia Williams be granted possession of
or access to the children?

 

The jury’s answer to both
questions was “No.”  Section 161.207 of
the Texas Family Code provides that the court shall appoint a suitable
competent adult or TDFPS as managing conservator if the court terminates the
parent-child relationship with respect to both parents or to the only living
parent.  Tex. Fam. Code Ann. § 161.207 (Vernon 2008).

            The
grandmother, Patricia, sought conservatorship and possession or access based on
her position that it was in the children’s best interests to name her as sole
managing conservator.  This is a
contention that the evidence is legally and factually insufficient to support
the jury’s finding that a state agency, rather than a relative, should be
appointed as conservator of the children. 


            The
standard of review for this matter is much different from that used above in
reviewing termination.  In cases tried to
the court, conservatorship determinations are subject to review only for abuse
of discretion and may be reversed only if the decision is arbitrary and
unreasonable.  Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982).  In a jury trial, a trial court may not render
an order in contravention of the jury’s findings.  Tex.
Fam. Code Ann. § 105.002(c)(1)(A) (Vernon Supp. 2009).  The jury findings underlying a
conservatorship appointment are subject to ordinary legal and factual
sufficiency review.  In re J.A.J., 243 S.W.3d 611, 617 n.5 (Tex. 2007); see, e.g., Corrales v. Dep’t of Family & Protective Servs., 155 S.W.3d
478, 487–88 (Tex. App.—El Paso 2004, no pet.).  In analyzing these issues, we thus apply the
familiar standard of review for legal and factual sufficiency in civil cases in
which the burden of proof at trial was by a preponderance of the evidence.  See In
re T.T., 228 S.W.3d 312, 325 (Tex. App.—Houston [14th Dist.] 2007, pet.
denied); Corrales, 155 S.W.3d at 488.

            “The
best interest of the child shall always be the primary consideration of the
court in determining issues of conservatorship and possession of and access to
the child.”  Tex. Fam. Code Ann. § 153.002 (Vernon 2008).  Cases such as the case at bar are “intensely
fact driven, which is why courts have developed best-interest tests that
consider and balance numerous factors.”  Lenz v. Lenz, 79 S.W.3d 10, 18–19 (Tex.
2002); In re K.L.W., 300 S.W.3d 423,
425 (Tex. App.—Dallas 2009, no pet.).  

            In
reviewing a challenge to the legal sufficiency of the evidence, we must
determine whether the evidence, as a whole, would enable reasonable and
fair-minded people to differ in their conclusions.  See
OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P., 234 S.W.3d 726,
736 (Tex. App.—Dallas 2007, pet. denied). 
We view the evidence in the light favorable to the findings, crediting
favorable evidence if a reasonable fact-finder could, and disregarding contrary
evidence unless a reasonable fact-finder could not.  City of
Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  Anything more than a scintilla of evidence is
legally sufficient to support a challenged finding.  See
OAIC Commercial Assets, 234 S.W.3d at 736.  


            When
reviewing a factual insufficiency challenge, we consider all of the evidence
and determine whether the verdict is so contrary to the great weight and
preponderance of the evidence as to be manifestly unjust.  See
Corrales, 155 S.W.3d at 488–89.

            We
note the presumption that appointing a parent as conservator that is so
strongly embedded in Texas law is not implicated in this case, as a grandparent
is the party involved.  Tex. Fam. Code Ann. § 101.024 (Vernon
2008), § 153.433 (Vernon Supp. 2009); see
Lewelling v. Lewelling, 796 S.W.2d
164, 166 (Tex. 1990); Critz v. Critz,
297 S.W.3d 464, 468–71 (Tex. App.—Fort Worth 2009, no pet.); In re B.B.M., 291 S.W.3d 463, 467 (Tex.
App.—Dallas 2009, pet. denied). 

            The
critical issue remains, as in all decisions of this nature, the best interest
of the children.  Tex. Fam. Code Ann. § 153.002.  Determining a minor’s best interest requires
the fact-finder to review the possible benefits and detriments to the minor as
enunciated in Holley, which we have
previously enumerated.  Holley, 544 S.W.2d at 371–72; see In re C.A.M.M., 243 S.W.3d 211, 221
(Tex. App.—Houston [14th Dist.] 2007, pet. denied).

            In
this case, the TDFPS relies on evidence of Patricia’s behavior to show that the
jury’s finding was supported by the evidence. 
There was evidence before the jury that on one occasion, Patricia had
left the children with Princess, against the express terms of the order, and
had used marihuana while so doing (the incident that immediately resulted in
the children’s removal by TDFPS).  There
was also evidence Patricia had been arrested in 2002 and received deferred
adjudication for assault—but also that she had successfully completed the
community supervision.  She had been
working as a health care provider, with her sole client being her own aged
mother.  That job had ended, and at the
time of the hearing, she was unemployed. 

            The
TDFPS also questioned Patricia about the loud and obnoxious behavior of two of
her nieces and her other daughter (Chaleta) while in her company at the local
hospital—sufficient that hospital personnel called the police, and about the
behavior of Chaleta’s son (a cousin to these children) who cursed and allegedly
threatened the TDFPS officer while she was removing the children from Patricia’s
custody.  (Specifically, the officer
testified he was a “young male that addressed me as a bitch and said that he
was going to whip my ass if I thought I was going to take his cousins.”)  Chaleta approached the worker and apologized
for her son’s behavior—and another man grabbed him and physically removed him
from the area.  The record also contains
a number of hypothetical questions by the TDFPS about how Patricia would react
should the other grandparents or one of the fathers appear (as there was
evidently a substantial feud developed between the families).  The TDFPS attempted to show that Patricia had
not attempted to protect the worker or intervene in the situation.  The evidence is inconsistent as to whether
Patricia was outside at the time.  She
testified that she only heard the commotion through the walls while she was
getting the children ready to be taken by the TDFPS and taking J.A.W. to the
bathroom, but the TDFPS worker testified Patricia was outside with the children
at that time, and they had gone back in afterward so J.A.W. could use the
bathroom.  

            The
TDFPS also argues Patricia had not sought adequate assistance for
Princess.  That appears to be based on
evidence that although Patricia acknowledged that Princess could not take care
of herself, she had nevertheless failed to seek help from a local group that
assists the mentally retarded, and did not get her into activities designed to
help her with her domestic abuse situation. 
The TDFPS also attempted to obtain testimony to cast doubt on Patricia’s
statements that she had no alcohol or drug problem—and failed.  

            There
was testimony that J.A.W. was having difficulties in school, and the TDFPS also
elicited testimony from Patricia showing that she had failed to get more
involved in J.A.W.’s school activities or to attempt to help her to progress
despite difficulties pointed out by her teachers.  There was also testimony that S.P.W. had lung
problems from scar tissue, and required monitoring for breathing-related
problems—and prompt use of a nebulizer for care.  When asked about her plans for the children,
she described the room she had ready for them, complete with pink paint and
stuffed animals, and how she wanted to take them home.  

            In
contrast, there is testimony from Timika Wesley, a case manager for East Texas
Child Advocates.  She was appointed by
the trial court as the guardian ad litem for the children, and had been
involved with the case from February 2008. 
She testified she had attended every meeting TDFPS had set up, every
court appearance, had reviewed the notes made by the TDFPS workers, the
therapists, the medical notes about the children, and had talked with J.A.W.,
and had been in their presence in a number of contexts.  Wesley stated that she had testified in more
than twenty cases and that this was the only case in which she had not
recommended termination.  She testified
that Patricia’s home was clean, well kept, that the older child did not act out
while there and that the caring relationship between Patricia and the children
was obvious.  She testified that she had
actually seen the children four or five times (including court
appearances).  She acknowledged Patricia’s
use of marihuana, but also pointed out that it was a single mistake by
Patricia. When asked if Patricia had since taken and passed a hair follicle
test, Wesley answered “Yes.”[5]  Wesley also testified that from her first
meeting with TDFPS, she believed the TDFPS never had any intention of returning
the children and was seeking termination from the beginning.  Her testimony, as narrowed by
cross-examination, was that she believed Patricia would be an appropriate
caregiver for the children—and that none of the other individuals involved in
this action would be.  

            Evidence
was placed before the jury that could have supported a variety of
responses.  There was evidence which, if
believed by the jury, would have supported a conclusion that Patricia was a
loving, reasonably capable caregiver for the children and that she had finally
realized that she simply could not, under any circumstances, leave Princess
alone with the children.  There was
evidence of drug use, but that evidence was of a single use, which the jury
could have concluded was the only time that mistake was made.  There was evidence that much of the extended
family was destructive and combative and that Patricia nonetheless remained in
their company—although there was also evidence that she would control their
access and proximity to the children. 
There was evidence that she was unemployed, but looking for work, and
that she had recently moved, but that her new apartment had a room ready for
the children.  There was evidence that
she loved the children and would do what was best for them, but also evidence
that she had not made efforts to assist Princess in obtaining help, or J.A.W.
in becoming more capable at school. 
There was evidence that J.A.W. had seemed well-adjusted while at
Patricia’s home, but also evidence that when she entered school at age six, she
was only at about a three- to four-year age level of capability, and emotionally
uncontrolled—and that this improved when she went into foster care and began
having more directed training and assistance. 

            The
jury’s role in this proceeding is to sort the wheat from the chaff and
determine which positions are viable. 
The court of appeals is not a fact-finder.  Accordingly, we may not pass on the witnesses’
credibility or substitute our judgment for that of the jury, even if the
evidence would clearly support a different result.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  Under the applicable standards of review, we
conclude the evidence is legally and factually sufficient to support the jury’s
finding that Patricia should not be appointed sole managing conservator of the
children.  See Corrales, 155 S.W.3d at 489–91 (concluding evidence legally and
factually sufficient to support jury’s finding that TDFPS rather than children’s
grandmother should be appointed sole managing conservator on termination of
parents’ parental rights).  The
contention of error is overruled.

VI.       BATSON CHALLENGE

            Princess,
Patricia, and Brandon all contend that the trial court committed reversible
error by overruling her Batson objection
to strikes made by the TDFPS.   

            This
argument by Princess and Brandon, however, is foreclosed by the fact that they
did not voice their own objections and because there was no ruling by the court
that the objections of one co-party were deemed joined by all.  In such an instance, the claim of Batson error is not preserved for review
as to Princess or by Brandon, but is preserved as to Patricia, whose attorney
raised the objection.  See Southwell v. Univ. of Incarnate Word,
974 S.W.3d 351, 353–54 (Tex. App.—San Antonio 1998, pet. denied); Owens-Corning Fiberglas Corp. v. Malone,
916 S.W.2d 551, 556 (Tex. App.—Houston [1st Dist.] 1996), aff’d, 972 S.W.2d 35 (Tex. 1998); How Ins. Co. v. Patriot Fin. Servs. of Tex., Inc., 786 S.W.2d 533,
544–45 (Tex. App.—Austin 1990, writ denied), overruled on other grounds, 843 S.W.2d 464 (Tex. 1992); Frederick
C. Moss, Rethinking Texas Evidence Rule
103, 56 Baylor L. Rev. 503,
539–40 (2004).

            We now turn to a
review of the Batson contention as presented on behalf of Patricia.  In Batson, the United States
Supreme Court, under the Equal Protection Clause, prohibited the use of
racially discriminatory peremptory challenges by the State in an individual
trial.  In Edmonson v. Leesville
Concrete Co., 500 U.S. 614,
616 (1991), the right was extended to civil litigants.  See
Powers v. Palacios, 813 S.W.2d
489, 491 (Tex. 1991).

            Under
Batson procedures, the opponent of
the peremptory challenge must first establish a prima facie case of racial
discrimination, and the burden then shifts to the party who exercised the
strike to come forward with a race-neutral explanation; at the third step of
the process, the trial court must determine if the party challenging the strike
has proven purposeful racial discrimination, and the trial court may believe or
not believe the explanation offered by the party who exercised the peremptory
challenge.  Davis v. Fisk Elec. Co., 268 S.W.3d 508 (Tex. 2008).

            In
contrast to the federal system, which employs a “clearly erroneous” standard of
review, we review a trial court’s Batson
ruling for abuse of discretion.  Davis, 268 S.W.3d at 515.  A trial court abuses
its discretion if its decision is arbitrary, unreasonable, and without
reference to guiding principles.  Goode v. Shoukfeh, 943 S.W.2d 441, 446
(Tex. 1997).  The Davis opinion relies heavily on the most recent United States
Supreme Court decision on the issue, Miller-El
v. Dretke, 545 U.S. 231, 237 (2005). 
The Davis court recognized
that the entirety of the situation was to be reviewed in determining the Batson challenge, and pointed out the
factors that were used by the United States Supreme Court in Miller-El to assist in making its
decision.  Those factors included an
analysis of statistical data about the prosecution’s use of its peremptory
strikes (strikes used to exclude ninety-one percent of the eligible
African-American venire members), a side-by-side comparison of the reasons
given to strike black panelists and white panelists who were allowed to serve
despite similar situations, and other considerations not applicable here.  Id.
at 260–63.  

            The
Davis court also noted that a Batson challenge does not call for a “mere
exercise in thinking up any rational basis” and that the prosecutor either
stands or falls on the plausibility of the reasons he or she gives—not on the
basis of reasons substituted by the appellate court.  Miller-El,
545 U.S. at 251–52.  

            At
the end of voir dire, Patricia raised the objection after the TDFPS struck the
only two African-American venire members. 
The TDFPS stated that as to the first juror, Chris Gray, the strike was
because Gray had indicated that she knew Princess, had watched her grow up, and
knew Patricia, and had been a friend for years. 


            Defense
counsel argues that Gray’s answers were somewhat different from those recounted
by the TDFPS—mainly because Gray made it clear that they had never been close
friends or visited in each other’s homes, and because Gray had not seen them in
the eight years since Gray had moved away. 
She stated she had lost contact with Patricia, “But every now and then I
run into her like in the mall.  I’ve
watched those children grow up.”  She
knew Princess as well, but she did not get together with Patricia as she was a
busy single parent.  When the children
graduated, “I kind of went my way and she went her way.”  

            Based
on these answers, counsel argues that the court abused its discretion by
overruling the Batson challenge.  He argues the TDFPS has failed to show that
its strike was for race-neutral reasons—and that its explanation was nothing
more than a pretext for the strike, because Gray’s actual answers show that she
was not a close friend of Patricia, had not seen her for over eight years, and
they did not see each other socially.  

            We
disagree.  Although the relationship was
not close, the fact remained that there was a degree of familiarity between
Gray, Patricia, and Princess, they had at one time been neighbors, and she knew
both Princess and Patricia to some degree. 
It is viable, and not a racially based explanation.  We conclude the trial court did not abuse its
discretion by overruling the Batson
challenge.

            The
prosecutor stated as to the second juror, Darwin Johnson, that he was concerned
about his answer to a question about domestic violence:

[By TDFPS:] 
And he answered that question in a very peculiar way, at least that I
found to be peculiar, and I noted so on my notes at the time that he answered
that.  That he wouldn’t hold it against a
mother who was the victim of family violence -- Mr. Bratteli did ask this --
if it wasn’t her fault for -- or something to that effect.  But he seemed to -- it just made a question
in my mind as to like, well then does that mean it’s like it’s okay under some
circumstances to have family violence against a spouse or a mother?

 

            .
. . .

 

            I
don’t know that, you know, he said that, but that was the implication I took
from it.  And it’s off the strength of
that, given the nature that family violence is just entwined so much in this
case, that, you know, I felt like that was a good reason to strike him. 

 

When examined by defense counsel
and questioned about whether other venire members answered similarly, the TDFPS
went on to testify that:

There was a couple other folks that did, but it
was just the way that Mr. Johnson answered that question that, you know,
if she didn’t cause -- if she wasn’t at fault for it, he wouldn’t hold that
against her.  It’s the way that he
answered it that just like really grabbed my attention.  Because there again, as I just said it,
seemed to me by implication it was okay under some circumstances to have family
violence. 

 

The reason stated by counsel is
race-neutral.  The appellants argue that
the record indicates that other venire members gave similar answers and were
treated differently than the African American. 
“‘Disparate treatment,’ as such, cannot automatically be imputed in
every situation where one of the [TDFPS’s] reasons for striking a venireperson
would technically apply to another venireperson whom the [TDFPS] found
acceptable.”  Cantu v. State, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992).  “[I]t is unlikely that two venirepersons on
one panel will possess the same objectionable attribute or character trait in
precisely the same degree.  Such qualitative
distinctions may cause a prosecutor to challenge one venireperson and not the
other.”  Id. Furthermore, we give great deference to the trial court’s
decision on the issue of purposeful discrimination because it requires an
assessment of the credibility and content of the prosecutor’s reasons and all
other relevant facts and circumstances.  Alexander v. State, 866 S.W.2d 1, 8
(Tex. Crim. App. 1993).  We cannot clearly
say from the words used that what he gleaned as Johnson’s intent is a correct
understanding of his meaning.  However,
it is a possible meaning of his statement, and counsel and the court had the
opportunity to observe the witness’ demeanor. 
In such a situation, we cannot conclude that the trial court’s decision
was outside the scope of its discretion. 
The point of error is overruled.

            We
affirm the judgment.

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          January
26, 2010

Date Decided:             April
1, 2010

 











[1]The
evidence also showed that one of Nelderine’s daughters had convinced Princess
to put her name on Princess’ social security checks, and had been using them
for her own benefit.  





[2]The
five grounds for termination in the jury charge were:

                (1)           knowingly placing or allowing the
child to remain in conditions which endanger the physical or emotion well-being
of the child.  Tex. Fam. Code Ann. § 161.001(1)(D);

                (2)           engaging in conduct or knowingly
placing the child with persons who endanger the physical or emotion well-being
of the child.  Tex. Fam. Code Ann. § 161.001(1)(E);

                (3)           constructively abandoning the child
in the TDFPS’s custody.  Tex. Fam. Code Ann.
§ 161.001(1)(N);

                (4)           failing to comply with a court order
establishing the actions necessary for return of the child.  Tex.
Fam. Code Ann. § 161.001(1)(O); and 

                (5)           having a mental or emotional illness
or mental deficiency that rendered her unable to provide for the physical,
emotional, and mental needs of the child and that such will continue until the
child’s eighteenth birthday.  Tex. Fam. Code Ann. § 161.003 (Vernon
2008). 





[3]An
appellate court reviewing a termination of parental rights on the TDFPS’s
petition “may not consider any issue that was not specifically presented to the
trial court in a timely filed statement of the points on which the party
intends to appeal . . . .”  Tex. Fam. Code Ann. § 263.405(i)
(Vernon 2008).  To be timely, the
statement of points must be filed within fifteen days of the date of the final
order.  Tex.
Fam. Code Ann. § 263.405(b) (Vernon 2008).  





[4]Batson
v. Kentucky, 476 U.S. 79
(1986).





[5]We
recognize that the TDFPS promptly objected to that statement as not based on
evidence before the court.  Although
there was some discussion, and a reformulation of the question by counsel, the
court did not rule on its admissibility.